**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

SAMUEL GARSON, Individually and On Behalf of All Others Similarly Situated,

     Plaintiff,

v.

DMC GLOBAL INC.,
MICHAEL KUTA, and
ERIC V. WALTER,

     Defendants.

_____

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND JURY DEMAND**

_____

Plaintiff Samuel Garson ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Plaintiff's counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by DMC Global Inc. ("DMC Global," "DMC" or the "Company"), press releases, transcripts and other public statements issued by, or about, the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of DMC Global securities (the "Class") between May 3, 2024 and November 4, 2024, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

3.      Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d).  DMC Global maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

- 1 -

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications and the facilities of the NASDAQ, a national securities exchange.

**PARTIES**

5.      Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased DMC Global securities during the Class Period and has been damaged thereby.

6.      Defendant DMC Global is a diversified industrial company headquartered in Broomfield, Colorado.  The Company's common stock trades on the NASDAQ under the ticker symbol "BOOM."

7.      Defendant Michael Kuta ("Kuta") has been DMC Global's President, Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") since August 2023. He previously was DMC Global's interim co-CEO from January 2023 until August 2023.  From 2014 to January 2023, Kuta was DMC Global's Chief Financial Officer ("CFO").  On November 13, 2024, the Company announced that Kuta would retire as the Company's President, CEO and as a member of the Board effective November 29, 2024.

8.      Defendant Eric V. Walter ("Walter") has been the Company's CFO since January 2023.

9.      Defendants Kuta and Walter are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are "Defendants."  Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about DMC Global's business, operations, and present and future business prospects

via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  Defendants' false and misleading statements and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each

Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

13.    Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of DMC Global securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding DMC Global's business, operations, and present and future business prospects, and caused Plaintiff and the Class to purchase DMC Global securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

14.    DMC Global began as an unincorporated business named "Explosive Fabricators," established in Colorado in 1965. It was incorporated in 1971 under the name "E.F. Industries, Inc.," which later became "Explosive Fabricators, Inc." The Company went public in 1976. In 1994, it rebranded as "Dynamic Materials Corporation."

15.    In 2001, DMC Global acquired substantially all of the stock of NobelClad Europe SA, a French company, expanding its explosive metalworking operations into Europe. In 2007, the Company acquired DynaEnergetics GmbH & Co. KG, a German company, along with its affiliates, further enhancing its European operations and adding a complementary energy products business.

- 4 -

16.     In 2013, DMC Global consolidated its explosive metalworking operations under the NobelClad brand and, in 2014, rebranded its energy products segment as DynaEnergetics.  The Company changed its name to DMC Global Inc. in 2016.  In 2021, DMC Global acquired a 60% stake in Arcadia Products, LLC ("Arcadia Products"), diversifying its market reach and expanding its addressable markets.

17.     As a result, DMC Global is now a publicly-traded, diversified industrial company that operates through three main business and reporting segments: (i) Arcadia Products: specializing in architectural building products, including composite decking, railing, and other outdoor living products; (ii) DynaEnergetics: focusing on energy products, particularly in the oil and gas industry, offering perforating systems and other well-completion tools; and (iii) NobelClad: developing and manufacturing explosion-resistant composite metals used in various industries, including oil and gas, marine, and defense.

18.     During the years ended December 31, 2023 and 2022, Arcadia Products represented approximately 42% and 46% of DMC Global's consolidated net sales, DynaEnergetics represented approximately 44% and 40%, and NobelClad represented approximately 15% and 14%, respectively.

19.     In 2023, DMC Global initiated a plan to improve its operations and systems, and evaluate and develop new operating strategies for its three business units.

20.     On January 5, 2023, the Company announced that James Chilcoff ("Chilcoff") had been appointed as President to lead Arcadia Products.  A DMC Global press release stated:

> "Jamie is an accomplished leader in the building products industry," said Kevin Longe, president and CEO of DMC. "His extensive background in operations, manufacturing, sales, supply chain, finance and product-line management will be invaluable as Arcadia continues to streamline operations, increase production

capacity and expand the markets for its commercial exterior, commercial interior and high-end residential product lines."

21.    On August 7, 2023, the Company announced that Kuta had been appointed President, CEO and director, "effective immediately."  The press release quoted the Company's Chairman as stating: "Mike's leadership skills, strategic thinking, and deep knowledge of DMC's businesses and culture made it clear he was the ideal person to lead the Company. . . .  The [B]oard and I look forward to supporting Mike and his leadership team as they aggressively work to execute on DMC's strategy and move the Company forward."

22.    On November 13, 2023, the Company announced that James O'Leary had been appointed to be an independent director.  The press release quoted the Company's Chairman as stating: "Jim brings a wealth of relevant experience and expertise to the DMC [B]oard, and we are thrilled to welcome him as a new director. His insights and guidance will be invaluable as DMC continues to execute its strategy."

23.    On January 29, 2024, DMC Global issued a press release entitled, "DMC Global Announces Strategic Alternatives Process for DynaEnergetics and NobelClad Businesses."  The press release described Arcadia Products as the Company's "core division," and it also stated in relevant part:

> [DMC Global] today announced its board of directors ("the Board") has initiated a review of strategic alternatives for its DynaEnergetics and NobelClad businesses.
>
> The strategic review process formalizes DMC's ongoing efforts over the past several months to consider opportunities for unlocking shareholder value. The Board has retained a financial advisor and may retain other advisors to assist the Board in evaluating DMC's current strategy, operations, and capital structure. The Board will consider various strategic, business, and financial alternatives for DMC's DynaEnergetics and NobelClad businesses. These could include, among other things, a sale, a merger or other business combination of a portion of DMC's business-unit assets, and/or a strategic investment.

David Aldous, DMC's chairman, said, "One year ago, we began evaluating and developing new operating strategies for our business units. Since Michael Kuta's appointment as CEO less than six months ago, we have been executing those strategies, and now are focused on opportunities to maximize the value of our portfolio with the help of our financial advisor."

Aldous continued, "Arcadia Products is a core division of DMC, and we are taking a very focused approach toward maximizing its differentiated business model and capitalizing on growth opportunities within its large addressable markets. Both DynaEnergetics and NobelClad are valuable, industry-leading businesses with strong margin profiles. However, the Board and management team are aligned with the view expressed by many DMC shareholders that the Company should seek to simplify its portfolio to drive improved shareholder value. During the review process, the Board and management team will continue to execute DMC's strategy and will remain very focused on running our businesses."

24.    DMC Global's primary division, Arcadia Products, which was acquired in 2021, accounted for all of the goodwill on DMC Global's books.  According to DMC Global's SEC Form 10-K for the year ended December 31, 2023, at that time the carrying value of its goodwill was $141,725,000.  The Company further described how it accounted for "goodwill" as follows:

Goodwill represents the amount by which the purchase price exceeds the fair value of identifiable tangible and intangible assets and liabilities acquired in a business combination. Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management. The Company's reporting units are each of the three operating segments disclosed in Note 10 within Item 8 — Financial Statements and Supplementary Data.

To test goodwill for impairment, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the

- 7 -

reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.

The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. In the Company's quantitative assessment, we estimate the fair value of a reporting unit by using the income approach, specifically a discounted cash flow analysis. A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.

As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the income approach. If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

25.     On May 2, 2024, after the markets closed, DMC Global issued a press release entitled, "DMC Global Reports First Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by defendant Walter.  The press release announced Q1 2024 results including: $2.3 million in net income; $4.2 million in adjusted net income; $0.21 adjusted diluted EPS; $16.7 million in adjusted EBITDA (attributable to DMC Global); and $19 million total

adjusted EBITDA, inclusive of non-controlling interest ("NCI"). The press release also included Q2 2024 guidance including $161 million to $171 million in sales ($64 million to $68 million attributed to Arcadia) with adjusted EBITDA of $14 million to $17 million (including $7 million to $9 million attributed to Arcadia before NCI allocation).

26.     The press release further stated, in part[1]:

"DMC's first quarter sales declined 9% versus the same quarter last year, reflecting challenging market conditions at two of our three industrial manufacturing businesses," said Michael Kuta, president and CEO. "*Arcadia Products, our architectural building products business, was impacted by a late-quarter slowdown in short-cycle commercial activity, lower sales at its high-end residential division, and an approximately 10% decline in aluminum pricing versus last year's first quarter.* DynaEnergetics, our energy products business, reported steady demand and record unit sales of its industry-leading DynaStage perforating system, but was impacted by ongoing pricing pressure in its primary North American onshore market. NobelClad, our composite metals business, delivered strong first quarter results, with sales and adjusted EBITDA above our forecasts."

*Arcadia Products reported first quarter sales of $61.9 million, down 23% from last year's first quarter. Adjusted EBITDA margin was 9.5%, down from 13.0% in the first quarter last year. The drop off in short-cycle commercial sales at certain Arcadia service centers reflects soft construction activity in portions of Arcadia's western and southwestern U.S. service territory, while Arcadia's ultra-high-end residential division experienced a sharp decline in its order backlog in March.*

27.     On May 2, 2024, after the markets closed, DMC Global also filed its Q1 2024 Form 10-Q with the SEC which was signed by defendant Walter and Brett Seger, the Company's Chief Accounting Officer. The Form 10-Q repeated the Q1 2024 results from the press release including: $2,319,000 in net income; $4,167,000 in adjusted net income; $0.21 adjusted diluted EPS; $16,683,000 in adjusted EBITDA (less EBITDA attributable to NCI); and $19,045,000 total adjusted EBITDA. The Form 10-Q also reported goodwill of $141,725,000 as of March 31, 2024.

---

[1] Unless noted, all emphasis in quoted materials is added.

28.      Attached to the Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act ("SOX") signed by defendants Kuta and Walter attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The Form 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

29.      Later, on May 2, 2024, DMC Global held a conference call with analysts and investors to discuss the Company's Q1 2024 results.  On the call, defendant Kuta had the following colloquy with a participating analyst:

> [Analyst]  Do you know how much of that storefront business is new build versus like replacement type business? Or is that just hard to gauge because it's – you have trucks lining up there just taking sticks every day. You may not [indiscernible] curious if you have – is it a new build or replacement or too hard to tell?
>
> [Kuta]  It's too hard to tell right now. *We're actually getting a lot of good visibility now out of our ERP system.* We're not there on that yet, [Analyst]. Hopefully, in the coming months, quarters, we can start talking a little bit more about that. But it's certainly a mix of new build and repair and remodel.
>
> [Analyst]  Got it. And then speaking to the ERP system. I did a quick – aluminum prices actually looked like they kind of spiked a little bit through April past. *There's been a little bit of mismatch between sort of inventory coming out, product going out with the ERP system, right? Any concern there?* Or we sort of move beyond that or...
>
> [Kuta]  *I don't see any concern there. There's a tick up there in aluminum. Hopefully, we might even be able to capture some margin there. So I don't think anything to be concerned about.* Maybe even a little bit upside there as we kind of move through the year.

- 10 -

30.     Defendants' statements in ¶¶25–29 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts about DMC Global's business, operations, and prospects which were known to Defendants or recklessly disregarded by them: (i) the goodwill associated with Acadia Products was overstated due to the adverse events and circumstances affecting that reporting segment; (ii) DMC Global's materially inadequate internal systems and processes were adversely affecting its operations; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate guidance and that its public disclosures were timely, accurate, and complete; (iv) as a result, Defendants misrepresented DMC Global's operations and financial results; and/or (v) as a result, the Company's public statements were materially false, misleading, or lacked a reasonable basis when made.

31.     On August 1, 2024, after the markets closed, DMC Global issued a press release entitled, "DMC Global Reports Second Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by defendant Walter.  The press release announced Q2 2024 results including: $6.3 million in net income; $5.7 million in adjusted net income; $0.29 adjusted diluted EPS; $19.4 million in adjusted EBITDA (attributable to DMC Global); and $24.4 million total adjusted EBITDA, inclusive of NCI.  The press release also included Q3 2024 guidance including $158 million to $168 million in sales ($64 million to $68 million attributed to Arcadia Products) with adjusted EBITDA of $15 million to $18 million (including $10 million to $12 million attributed to Arcadia Products before non-controlling interest allocation).

32.     On August 1, 2024, after the markets closed, DMC Global also filed its Q2 2024 Form 10-Q with the SEC which was signed by defendant Walter and Brett Seger, the Company's

Chief Accounting Officer.  The Form 10-Q repeated the Q2 2024 results from the press release including: $6,293,000 in net income; $5,675,000 in adjusted net income; $0.29 adjusted diluted EPS; $19,420,000 in adjusted EBITDA (less EBITDA attributable to NCI); and $24,398,000 total adjusted EBITDA.  The Form 10-Q also reported goodwill of $141,725,000 as of June 30, 2024.

33.     Attached to the Form 10-Q were SOX certifications signed by defendants Kuta and Walter attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The Form 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

34.     Later, on August 1, 2024, DMC Global held a conference call with analysts and investors to discuss the Company's Q2 2024 results.  On the call, defendant Kuta had the following colloquy with a participating analyst:

> [Analyst]  *I guess I'll start with Arcadia. Obviously, the market is still pretty weak. It looks like you're expecting revenue down sequentially here from second quarter. I know you're not ready to give fourth quarter guidance or anything, but I'm curious about what the customers are kind of saying in terms of longer-term visibility? And how they're kind of thinking about stabilization or timing of stabilization within that market specifically?*
>
> [Kuta] I think that we've got a couple of -- I mean, just looking at the indicators out there and that we all look at, whether it's ABI in the West at 43 spot run or the Dodge Momentum Index, which points towards some favorable end markets, but once again driven by very kind of specific markets like data centers [indiscernible]. So I mean, you see all the same data that we do. *From a customer perspective, I*

- 12 -

*think we're seeing – it's going to be soft markets for a couple of quarters here as we go out into the year.*

I think the good -- and in particular, when you look at our Q2, we were pretty resilient. We're seeing, obviously, our exposure to diverse end markets. Our bookings are relatively consistent and quoting activity has been good. *But there's folks citing interest rates that are pushing projects out.*

*So look, I think we've got a couple more quarters of softness. But I do think our guidance -- we guided in Q2 64% to 68%, Q3 is another 64% to 68% because that's sort of what the market is serving up. What we're doing though is the things that we can control, and we're talking about improving our operational effectiveness is really driving the profitability and the EBITDA at the bottom line and driving cash flow. And I feel confident that we're going to do that the remainder of this year for whatever the market serves up.*

35.     Defendants' statements in ¶¶31–34 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts about DMC Global's business, operations, and prospects which were known to Defendants or recklessly disregarded by them: (i) the goodwill associated with Acadia Products was overstated due to the adverse events and circumstances affecting that reporting segment; (ii) DMC Global's materially inadequate internal systems and processes were adversely affecting its operations; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate guidance and that its public disclosures were timely, accurate, and complete; (iv) as a result, Defendants misrepresented DMC Global's operations, financial results, and outlook; and/or (v) as a result, the Company's public statements were materially false, misleading, or lacked a reasonable basis when made.

36.     On October 9, 2024, after the markets closed, DMC Global filed a Form 8-K with the SEC which said in relevant part:

On October 8, 2024, James Chilcoff stepped down as President of Arcadia Products, LLC ("Arcadia"), the architectural building products segment of DMC

- 13 -

Global Inc. (the "Company"), effective immediately. In connection with Mr. Chilcoff's departure, the Company and Mr. Chilcoff expect to enter into a separation agreement and release pursuant to which the Company will agree to provide Mr. Chilcoff certain severance benefits, contingent upon his execution, delivery and non-revocation of a release of claims against the Company and its subsidiaries, and his compliance with certain covenants contained therein.

37.     Defendants' statements in ¶36 were materially misleading when made because they failed to disclose that Chilcoff's removal was due to the abysmal Q3 2024 performance of Arcadia Products which had already caused DMC Global to fall far short of Q3 2024 guidance and Arcadia Product's materially inadequate internal systems and processes which were continuing to adversely affect its operations.  Defendants further had a duty to immediately update DMC Global's Q3 2024 outlook as a result of the foregoing.

### THE TRUTH IS GRADUALLY REVEALED

38.     On October 21, 2024, after market close, the Company issued a press release entitled, "DMC Global Provides Business and Strategic Review Update, Announces Governance Changes," which it also filed on Form 8-K with the SEC, and which stated in pertinent part:

DMC Global [] today provided an update on its business conditions and revised its third quarter financial guidance. The Company also commented on its strategic review process and announced governance changes. DMC said third quarter sales are expected to be approximately $152 million versus prior guidance of $158 million to $168 million. The results reflect weaker-than-expected sales at both Arcadia Products ("Arcadia"), DMC's architectural building products business, and DynaEnergetics, DMC's energy products business.

Adjusted EBITDA* is now expected to be approximately $5 million versus prior guidance of $15 million to $18 million. Third quarter results will include inventory and bad debt charges at DynaEnergetics totaling approximately $5 million, as well as lower fixed overhead absorption on reduced sales at both Arcadia and DynaEnergetics.

The Company said its third quarter financial results will include an approximate $142 million non-cash goodwill impairment charge associated with DMC's December 2021 acquisition of a controlling interest in Arcadia. The charge reflects

Arcadia's recent financial performance and near-term outlook. These factors, combined with the significant decline in DMC's market capitalization, led the Company to conclude that the goodwill impairment charge was appropriate at this time.

DMC president and CEO Michael Kuta, who is also leading Arcadia on an interim basis, said, "Arcadia's third quarter performance was affected by weak commercial and high-end residential construction activity, lower fixed overhead absorption, and supply-chain disruptions that impacted product availability. Results at DynaEnergetics were below expectations due to declining North American well-completion activity, a higher mix of lower margin customers in DynaEnergetics' U.S. markets, and the aforementioned inventory and bad debt charges. NobelClad, our composite metals business, is expected to deliver another strong quarter with sales and adjusted EBITDA results within or above our forecasted range.

39.     On this news, DMC Global common stock dropped more than 18%, from a $12.93 per share closing price on October 21, 2024, to a close of $10.57 per share the next day, on extremely high volume.

40.     On November 4, 2024, after market close, the Company issued a press release entitled, "DMC Global Reports Third Quarter Financial Results," which it also filed on Form 8-K with the SEC, and in which it reported Q3 2024 sales of $152.4 million, a $159.4 million net loss (inclusive of a $141.7 million goodwill impairment charge at Arcadia Products), and adjusted EBITDA of $5.7 million.  The press release further stated, in part:

At Arcadia, DMC's architectural building products business, persistent high interest rates have impacted sales to the high-end luxury home market and have resulted in continued soft commercial construction activity. Under the direction of a new interim business president, Arcadia is executing a series of internal initiatives designed to strengthen sourcing and supply chain functions; improve sales, inventory and operations planning processes; and more effectively leverage Arcadia's enterprise resource planning system. The business is also reviewing certain product lines that have not consistently met profitability targets.

Arcadia's improvement initiatives are being led by interim president Chris Scocos, who joined the business in September 2024 with a 25-year track record of implementing lean manufacturing, process improvement and operational

- 15 -

excellence programs for industrial manufacturing businesses across a broad range of industries, including building materials and industrial manufactured products.

41.    Later, on November 4, 2024, the Company held a conference call with analysts and investors to discuss its Q3 2024 results.  On the call, defendant Kuta stated in part:

Arcadia, our architectural building products business, reported third quarter sales of $57.8 million, down 17% sequentially and down 19% versus the third quarter last year. Arcadia's third quarter Adjusted EBITDA margin was 5.8%, down from 17.8% in the second quarter and 18.8% year over year. The decline principally reflects lower fixed cost absorption on reduced sales.

Persistently high interest rates have negatively affected sales to Arcadia's high end luxury home market and also slowed commercial construction activity in several Arcadia's regional markets. Arcadia's third quarter is also impacted by supply chain disruptions that limited product availability.

We recently named Chris Scocos as our new Interim President at Arcadia. He brings an extensive background in lean manufacturing, operational excellence and improving plant productivity. His immediate focus is on strengthening sourcing and supply chain functions, improving sales inventory and operations planning processes and more effectively leveraging Arcadia's ERP system. We also are reviewing certain product lines that have not consistently met our profitability targets.

42.    On the call, DMC Global's Executive Chairman (and soon to be interim President and CEO), James O'Leary ("O'Leary"), and defendant Kuta had the following colloquy with participating analysts:

[Analyst]  Guys, I was hoping maybe to discuss a little bit more about the work they want to do at Arcadia and to improve operations. And then as maybe a subset to that question, are the systems in place to manage that? You talked about the ERP explicitly leveraging that, but just curious if all the systems are in place and then to go into a little bit more detail and maybe where some of the low-hanging food is or what have you, and what's the path forward on that front?

[O'Leary]  I'm going to turn it over to Mike on some of the specific initiatives that he and Chris [Scocos] have been initiating, accelerating, and I think pushing forward with the right skill sets for rarely the first time since the acquisition. A macro comment, which I think, again, we might have underestimated and certainly contributed to the goodwill write-off. We bought a family business. We bought a

family business that had excellent commercial people. They understood pricing, they understood their markets. They had the right titles, the right org charts, the right people that at first blush look like they'd be able to handle the amount of change that comes with being a public company.

And the digestion issues around ERP, putting in compliance around being a public company, making sure you've got not just people who have the title VP of supply chain, but actually know what that means, particularly in a post-COVID environment. We underestimated the challenges there. And a couple of, we took a few calls after our last press release. And to me, these are things that are simple to diagnose, easy to spot, not really wildly difficult to fix if you have people with the right skill set, but take time. And putting the ERP system on with the aggressiveness of the implementation, dealing with upgrading people happens with every family company acquisition I've ever seen. And really dealing with just the robustness of the systems and the people, exactly what you think in a family company.

The answer was no, and that led to the write-off. We've spotted, diagnosed, have fixes in for all of them, takes a little bit of time. You'd feel a lot better if it was at a time when elections behind us, whichever party puts in place is going help me put a little bit more wind in the sails of the housing market more broadly and construction. And interest rates being a little bit lower would help the high-end residential market. But that said, while it would be nice to have the wind in our sails, we recognize we don't. So we've got initiatives underway that are very specifically targeted to some of the things we probably could have been a little bit more respectful from the get-go on. Mike, you want to talk about some of the specific initiatives?

[Kuta]  Yes, [Analyst], so a couple of things that we're working on with the team relate to supply chain and sourcing so we can do a better job on both supply chain sourcing and planning as well as S&OP processes. So one of the gaps we have there is demand planning and knowing what we need when we need it. So that was, you know, some of my comments around the supply chain disruption. So we've got programs we're putting in place there, working on, you know, the other thing is there's some, there's the other item in the backend of our business is there's some improvements we can certainly make in our finishing operations. So, and a lot of that gets to, you get your supply chain deep bottlenecked and you got to get scheduling right and finishing up. So a lot of work we're doing on that to improve lead times on time and in full deliveries to customers, making sure we've got the shelf stock with product, making progress, but a ways to go. So there's good things happening, but it's going take some time as [O'Leary] mentioned to sort that out.

*       *       *

- 17 -

[Analyst]  Okay. Maybe switching over to the restructuring actions you're taking. One, I thought there was already an ERP implementation already kind of in place at Arcadia. So when you talk about the sourcing initiatives, just what's kind of involved with that? And is there any way to kind of size the cash cost that's going to be associated with some of these restructuring actions you're taking and how long you expect that payback to be?

[Kuta]  So these are additions. We haven't talked specifically about any restructuring, but certainly everything's on the table when you have results like we've had, but there's nothing that we're specifically announcing. All the additions are top grading, upgrading people. You're 100% correct. We've talked about ERP in the past, but it certainly could have gone smoother and really holding people accountable and getting some additional resources are in. The cash costs, it's kind of part of doing business when you're top grading and adding people. Like in the case of Chris [Scocos], Chris [Scocos] is replacing a guy that we let go who had a comparable salary. So it's not a huge incremental cost that we'd put a payback on.

43.     On this news, DMC Global common stock dropped another 6%, from a $9.84 per share closing price on November 4, 2024, to a close of $9.25 per share the next day, on unusually high volume.

44.     On November 13, 2024, the Company announced that defendant Kuta would retire as the Company's President, CEO and as a member of the Board effective November 29, 2024, and that James O'Leary would assume the role of interim President and CEO.

## ADDITIONAL SCIENTER ALLEGATIONS

45.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding DMC Global, their control over, and/or receipt and/or modification of DMC Global's allegedly

materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning DMC Global, participated in the fraudulent scheme alleged herein.

46.    The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  Given their executive-level positions with DMC Global, the Individual Defendants controlled the contents of DMC Global's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

47.    Plaintiff also alleges that scienter of the Individual Defendants (who, as executive officers and control persons of the Company, knew or recklessly ignored facts related to the core operations of DMC Global) can be imputed to DMC Global.

48.    Given Defendants' knowledge of and their misleading statements about DMC Global's business, operations and prospects made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused DMC Global's securities to trade at artificially inflated prices during the Class Period.

**LOSS CAUSATION**

49.     As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of DMC Global securities.  This scheme operated as a fraud or deceit on Class Period purchasers of DMC Global securities by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of DMC Global securities declined significantly as the prior artificial inflation came out of the price of DMC Global securities.

50.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of DMC Global's business, prospects and operations.  Defendants' false and misleading statements had the intended effect and caused DMC Global securities to trade at artificially inflated levels throughout the Class Period.  As a result of their purchases of DMC Global securities at artificially inflated prices during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

51.     When the truth about the Company was revealed to the market, the price of DMC Global securities fell significantly.  The decline began to remove the inflation from the price of DMC Global securities, causing real economic loss to investors who had purchased these securities during the Class Period.  The declines in the price of DMC Global securities when the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in DMC Global securities negate any inference that the loss suffered by Plaintiff and

the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

52.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of DMC Global securities and the subsequent significant decline in the value of these securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

53.     At all relevant times, the market for DMC Global securities was an efficient market for the following reasons, among others:

(a)     DMC Global securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, DMC Global filed periodic public reports with the SEC and the NASDAQ;

(c)     DMC Global regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     DMC Global was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for DMC Global securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of DMC Global securities.  Under these circumstances, all purchasers of DMC Global securities during the Class Period suffered similar injury through their purchase of these securities at artificially inflated prices and a presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations and financial prospects, information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

56.     The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-

looking statements.  Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DMC Global who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of DMC Global during the Class Period.  Excluded from the Class are Defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

58.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DMC Global securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DMC Global or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 23 -

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations, and management of DMC Global; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against All Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of DMC Global securities during the Class Period.

66.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DMC Global securities.  Plaintiff and the Class would not have purchased DMC Global securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of DMC Global securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

68.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

- 25 -

69.     The Individual Defendants acted as controlling persons of DMC Global within the meaning of § 20(a) of the Exchange Act.

70.     By virtue of their positions as officers and directors of DMC Global, and/or their beneficial ownership of DMC Global stock, the Individual Defendants had the power and authority to, and did, cause DMC Global to engage in the wrongful conduct alleged.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of DMC Global securities during the Class Period.

72.     By reason of such conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Designating Plaintiff as lead plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as lead counsel;

B.     Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.     Awarding Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  December 6, 2024

Respectfully submitted,

**JOHNSON FISTEL, LLP**

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, CO  80238
Telephone:  303/861-1764
303/861-1764 (fax)
jeffb@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

*Attorneys for Plaintiff*

Docusign Envelope ID: 07B93211-64E6-442B-8665-54CBECCFC492

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Samuel Garson ("Plaintiff") declares:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 4 day of December 2024.

Signed by:

5F8CD3E1B86D4AF...

Samuel Garson

**Schedule A**
**DMC Global Inc. (BOOM) Transactions – Samuel Garson**
**Class Period: May 3, 2024 and November 4, 2024**

| Date | Buy/Sell | # of shares | Price/share[1] |
|------|----------|-------------|-----------|
| 8/20/24 | Buy | 110 | $11.40 |
| 9/9/24 | Buy | 122 | $10.73 |
| 9/17/24 | Buy | 91 | $12.96 |
| 9/18/24 | Buy | 160 | $12.35 |
| 9/18/24 | Buy | 50 | $12.26 |
| 9/18/24 | Buy | 50 | $12.63 |
| 9/19/24 | Sell | 100 | $13.32 |
| 10/15/24 | Buy | 90 | $12.81 |
| 10/21/24 | Buy | 70 | $10.12 |
| 10/22/24 | Buy | 100 | $10.01 |

---

[1] Prices are rounded to two decimal points; includes trades outside of normal trading hours