**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Consolidated Civil Action No. 1:24-cv-03387-GPG-CYC

SAMUEL GARSON, Individually and On Behalf
of All Others Similarly Situated,

        Plaintiff,

    v.

DMC GLOBAL INC.,
MICHAEL KUTA,
ERIC V. WALTER, and
BRETT SEGER,

        Defendants.

---

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ..................................................................3

III.  PARTIES ....................................................................................................4

IV.   SUBSTANTIVE ALLEGATIONS .............................................................6

    A.    Background Of The Company..........................................................6

    B.    DMC's Acquisition Of Arcadia At The "Top Of The Market".........8

    C.    DMC's Acquisition Of Arcadia Created A $141 Million Goodwill Asset
        On DMC's Balance Sheet ............................................................13

    D.    Shortly After Acquiring Arcadia, Macroeconomic Headwinds Began
        To Pressure Arcadia's Business...................................................16

    E.    Despite Worsening Results And Growing Economic Headwinds,
        Defendants Continued To Report Robust And Unchanged Levels Of
        Goodwill For Arcadia, And Overstated Net Income.....................19

    F.    Defendants Cannot Disclaim Knowledge Of DMC's Obligation To
        Impair Arcadia's Goodwill Given Defendants' Focus On Arcadia,
        Installation Of Experienced Management In Key Positions, And
        Design Of ERP Systems To Better Monitor Arcadia .....................20

    G.    Defendants Improperly Delayed Recognizing A Goodwill Impairment
        Charge For Arcadia........................................................................26

    H.    Defendants Used DMC's Overstated Earnings And Balance Sheet
        To Secure Desperately Needed Capital For The Looming Put-Call
        Obligation ......................................................................................29

    I.    The Truth Emerges ........................................................................30

    J.    Post-Class Period Events ..............................................................37

V.    ADDITIONAL SCIENTER ALLEGATIONS ...........................................37

    A.    Defendants' Desire To Increase DMC's Credit Agreement By $100
        Million To Gain Access To Desperately Needed Financing Provided
        Motive............................................................................................37

    B.    Red Flags Informed Defendants Of A Need To Impair Arcadia's
        Goodwill By The End Of Q1 2024 At The Latest .........................41

        1.    The Reasons That Defendants Gave For Arcadia's Q3 2024
            Goodwill Impairment Existed In Q1 2024 ...........................41

i

2.      Any Incremental Deterioration Of Arcadia's Performance After Q1 2024 Was Negligible As Compared To The Deterioration That Occurred Up To And Including Q1 2024 ...................................45

3.      Additional Indicators Suggested Interim Testing For Impairment Was Necessary ...................................47

C.      DMC's Admission That It Acquired Arcadia At A Peak Valuation Supports Scienter Given The Rapid Rise In Interest Rates That Preceded The Class Period...............................................................50

D.      Defendants' Abrupt And Undisclosed Change To The Goodwill Valuation Methodology Supports A Strong Inference Of Scienter .............54

E.      Defendants' Shifting Explanations For Arcadia's Impairment Support A Strong Inference Of Scienter ...................................................56

F.      The Magnitude Of The Goodwill Impairment Supports A Strong Inference Of Scienter...............................................................58

G.      Arcadia Is Critical To DMC's Core Operations ...................................59

H.      The Individual Defendants' Significant Experience With Public Accounting And The Company's Finances Supports A Strong Inference Of Scienter...............................................................60

I.      Defendants Kuta And Walter Signed SOX Certifications ...........................61

J.      The Timing And Numerous Resignations Support A Strong Inference Of Scienter...............................................................62

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD....................................................63

A.      January 29, 2024 Press Release ...........................................................63

B.      2023 Form 10-K Statements And Omissions .................................................65

C.      First Quarter 2024 Statements And Omissions....................................................67

D.      Second Quarter 2024 Statements And Omissions....................................................68

VII.   LOSS CAUSATION ...........................................................................................70

VIII.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .........................72

IX.    THE PRESUMPTION OF RELIANCE ...................................................................72

X.     CLASS ACTION ALLEGATIONS ........................................................................74

XI.    CLAIMS FOR RELIEF ........................................................................................76

XII.   PRAYER FOR RELIEF ......................................................................................81

XIII.  JURY TRIAL DEMANDED.....................................................................................82

Lead Plaintiff John Mark Stauffer ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by DMC Global Inc. ("DMC Global," "DMC," or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by DMC; and (c) review of other publicly available information concerning DMC. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION**

1.      This is a securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired DMC securities between January 29, 2024 and November 4, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants DMC, Michael Kuta ("Kuta"), Eric V. Walter ("Walter"), and Brett Seger ("Seger") (collectively, "Defendants").

2.      This case arises from Defendants' overstatement of DMC's net income and assets and equity on its balance sheet by material amounts and for improperly delaying a massive goodwill impairment of $141.7 million during the Class Period. Defendant

DMC, which was led by Defendants Kuta, Walter, and Seger—all of whom were licensed Certified Public Accountants ("CPAs")—repeatedly overstated DMC's income and assets by failing to impair goodwill attributed to DMC's acquisition of Arcadia Products, LLC ("Arcadia" or "Arcadia Products"), despite mounting evidence and glaring red flags that such impairment was not only necessary, but obvious and inevitable.

3.      As alleged below, from the outset of the Class Period, Defendants falsely assured investors that Arcadia—which DMC acquired at "the top of the market" in late 2021 when interest rates were near zero—was performing well and that its $141.7 million goodwill valuation remained fully intact notwithstanding a surge in interest rates that both slowed demand for Arcadia's business and also reduced the value of DMC's goodwill valuation due to the existence of materially higher discount rates. Defendants' assurances came even as Arcadia's revenues and EBITDA declined sharply, missed projections, and despite clear impairment indicators that required Defendants to admit the truth.

4.      Instead of applying Generally Accepted Accounting Principles ("GAAP") required for public companies such as DMC, Defendants improperly delayed recognition of the impairment to maintain the appearance of financial stability at a time when Defendants were seeking to obtain credit to address a looming $187 million purchase obligation related to the Arcadia acquisition.

5.      When the truth finally emerged in late 2024—through a series of corrective disclosures including a $141.7 million impairment charge and admission that the Company had changed its goodwill valuation methodology—DMC's stock plummeted. When DMC belatedly disclosed DMC's then forthcoming goodwill impairment charge of

almost $142 million on October 21, 2024, the price of DMC stock fell over 18% per share, thereby damaging investors.

6.      DMC shares fell another 6% per share on November 4, 2024, when additional details were revealed, including that Defendants had brazenly changed the Company's goodwill valuation method without ever informing investors that was a possibility.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). DMC is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but

not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

12.    Lead Plaintiff John Mark Stauffer ("Plaintiff"), as set forth in the previously filed certification (ECF No. 28-3), incorporated by reference herein, purchased DMC common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant DMC Global Inc. ("DMC Global," "DMC," or the "Company") is a Delaware corporation with principal executive offices located at 11800 Ridge Parkway, Suite 300, Broomfield, Colorado 80021. The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BOOM."

14.    Defendant Michael Kuta ("Kuta") served as DMC's President, Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") from August 2023 through November 2024. On November 13, 2024, the Company announced that Kuta would "retire" as the Company's President, CEO, and as a member of the Board effective November 29, 2024.  Defendant Kuta was 49 years old in 2024. Defendant Kuta previously served as DMC's interim co-CEO from January 2023 until August 2023, and from 2014 to January 2023, Defendant Kuta was DMC's Chief Financial Officer ("CFO"). Defendant Kuta earned a bachelor's degree in accounting from Kent State University and

an MBA in finance from Case Western Reserve University. Defendant Kuta also was a Certified Public Accountant ("CPA").

15.      Defendant Eric V. Walter ("Walter") has served as DMC's CFO since February 28, 2023. Prior to this role, Walter served as the Company's Senior Vice President of Finance since joining the Company on January 23, 2023. Prior to joining DMC, Defendant Walter spent six years in executive positions in a large publicly traded engineering and professional services firm, including roles as CFO and leading the treasury of its largest divisions. Prior to that, Defendant Walter spent over 13 years at two large corporations in financial leadership roles. Defendant Walter graduated with a BA in Accounting and Business Administration from Furman University and an MBA from Duke University. Defendant Walter also holds the designations of CPA, Chartered Financial Analyst, and Certified Treasury Professional.

16.      Defendant Brett Seger ("Seger") has served as DMC's Chief Accounting Officer ("CAO") since March 1, 2023. He previously served as the Company's Vice President of Finance Integration since January 2022, with the primary responsibility of managing the coordination of significant financial activities relating to the Company's Arcadia division. Prior to joining the Company, Seger spent over a decade as an employee of Ernst & Young LLP ("EY"), most recently as an Audit Senior Manager. Defendant Seger graduated with a B.S. in Accounting and an MBA from the University of Denver and also holds the CPA professional designation.

17.     Defendants Kuta, Walter, and Seger are collectively referred to herein as the "Individual Defendants." DMC and the Individual Defendants are collectively referred to herein as "Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of DMC's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of DMC's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with DMC, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein. The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

IV.    <u>**SUBSTANTIVE ALLEGATIONS**</u>

A.    **Background Of The Company**

19.     The Company began as an unincorporated business called "Explosive Fabricators," which was formed in Colorado in 1965. The business was incorporated in 1971 under the name "E. F. Industries, Inc.," which was later changed to "Explosive

Fabricators, Inc." The Company became publicly traded in 1976. In 1994, it changed its name to "Dynamic Materials Corporation."

20.    In 2001, the Company acquired substantially all the stock of NobelClad Europe SA, a French company, which expanded the Company's explosive metalworking operations to Europe. In 2007, the Company acquired the German company DynaEnergetics GmbH and Co. KG and certain affiliates, which expanded the Company's explosive metalworking operations in Europe and added a complementary energy products business.

21.    In 2013, the Company branded its explosive metalworking operations under the single name NobelClad, and in 2014, the Company re-branded the energy products segment as DynaEnergetics.

22.    In 2016, the Company re-branded to its current name, "DMC Global Inc." From 2016 through 2021, DMC was comprised of NobelClad and DynaEnergetics. In an effort to diversify DMC's then existing business, on December 17, 2021, DMC announced its intention to acquire Arcadia.

23.    Following the acquisition of Arcadia (discussed below), DMC operates through three main business and reporting segments: **(1) Arcadia**, which supplies architectural building products, including exterior and interior framing systems, curtain walls, windows, doors, and interior partitions to the commercial construction market; it also supplies customized windows and doors to the high-end residential construction market; **(2) DynaEnergetics,** which designs, manufactures and sells highly engineered products utilized by the global oil and gas industry principally for the perforation of oil and

gas wells; and **(3) NobelClad**, which produces explosion-welded clad metal plates for use in the construction of corrosion resistant industrial processing equipment, as well as specialized transition joints for use in construction of commuter rail cars, ships, and liquified natural gas processing equipment.

**B.    DMC's Acquisition Of Arcadia At The "Top Of The Market"**

24.    Leading up to the Arcadia acquisition, Arcadia's underlying business had strong tailwinds behind it. For instance, following the global pandemic of 2020, the Federal Reserve slashed interest rates and injected trillions of dollars of liquidity into the bond market to stabilize the financial system. One effect of that additional liquidity was a historical drop in interest rates and a surge higher in prices for interest rate sensitive assets, such as real estate. The following charts illustrate the change in interest rates:





25.     Leading up to the Arcadia acquisition, Arcadia's revenue grew at a compound average growth rate ("CAGR") of 13%, and its adjusted earnings before interest taxes depreciation and amortization ("EBITDA"), which is a rough approximation of operating earnings, grew at a 23% CAGR.

26.     As a result, by late 2021, real estate prices were booming, and valuations for real estate related businesses, such as construction, had similarly risen rapidly. It was on the heels of that surge in asset prices (driven by a fall in interest rates), that on December 23, 2021, DMC acquired a 60% controlling stake in Arcadia, for $282.5 million in cash and DMC stock (hereinafter, the "Arcadia Acquisition"). Put differently, given Arcadia's strong growth, macro tailwinds (e.g., historical low interest rate environment), and high asset valuation, DMC paid a peak cycle price, which Defendants would later describe as buying at "the top of the market." (*See* below at ¶149). Buying at the top of the market means that almost shortly thereafter, prices and valuations fall substantially; i.e., it would be akin to buying internet stocks in 2000, or buying a house in 2006, where prices of those assets fell sharply in the years immediately thereafter. Buying at the top

of the market increases risk of the transaction, so investors would pay special attention to the resulting goodwill on such a transaction because, among other reasons, as long as goodwill remains fully intact, that representation signals to investors that the acquired business still commands a valuation—based on nonpublic projections of its cash flows that the Company possesses—that materially exceeds its book value (because otherwise it would be impaired, or written down).

27.     Following the closing of the Arcadia Acquisition, the remaining 40% minority interest in Arcadia continued to be held by New Arcadia Holdings, Inc., which is wholly-owned by Synergex Group LLC, Trustee of the Munera Family ESBT ("Munera"). The implied valuation for all of Arcadia at its closing was approximately $470 million.[1]

28.     At the time of the Arcadia Acquisition, DMC's total market capitalization was approximately $688.5 million, based on a closing share price of $36.74 on December 16, 2021, and fully diluted shares outstanding as of September 30, 2021, of 18.739 million.

29.     To fund a portion of the purchase price for the acquisition, DMC entered into a new five-year syndicated credit facility, which included a $150 million term loan and a $50 million revolving line of credit. The proceeds of the $150 million term loan were used to partially fund the acquisition. The credit facility was secured by the assets of DMC

---

[1] Because the Arcadia Acquisition was for 60% (rather than 100%), the implied valuation for the entire business would be the $282.5 million purchase price divided by .60 = $470.83 million. According to the Company's December 23, 2021 press release, the "total implied transaction value is $469.6 million." The difference between the two figures likely results from a rounding difference.

including accounts receivable, inventory, and fixed assets, as well as guarantees and share pledges by DMC and its subsidiaries, including the newly-acquired Arcadia.

30.     The Arcadia Acquisition also included a provision that DMC had the option to acquire the remaining 40% interest in Arcadia through a three-year call option that could be exercised beginning in December 2024. Similarly, Munera, as the seller, had its own option, enabling Munera to sell its remaining 40% interest to DMC through a corresponding three-year put option.

31.     A call option gives the holder of the call the right but not the obligation to purchase a given security at a predetermined exercise price, known as the strike price. For example, if one held a call on DMC stock with a $15 exercise price, and the stock price rose to $20, the holder of the call could buy DMC stock for $15, rather than the $20 prevailing price in the market.

32.     A put option is the mirror image, giving the holder of the put the right, but not the obligation, to sell a security at a given price. So, if DMC's stock instead fell from $15 per share to $10 per share, and the put had an exercise price of $15, then the put holder could sell DMC stock for $15, rather than the $10 prevailing price in the market.

33.     The mechanics of the DMC/Arcadia put/call provision were as follows. As part of the transaction, Munera received the put option on its 40% of Arcadia not sold to DMC, while DMC received a call option on the 40% of Arcadia that it did not buy. The December 21, 2021 Form 8-K stated that, "Munera shall have the right (but not the obligation) to require the Company to purchase (the 'Put Right') its interests in Arcadia for a price based on the higher of (a) a value based on the Acquisition purchase price and

(b) a multiple of Arcadia's average EBITDA for the preceding two fiscal years and its projected EBITDA for the then-current fiscal year (the 'Option Purchase Price'), and the Company shall have the right (but not the obligation) to purchase all of Munera's interests for the same price (the 'Call Right'). If the Put Right is exercised, the Option Purchase Price will be paid, at DMC's option, (i) in cash or (ii) 20% in cash and 80% in shares of preferred stock. If the Company, exercises the Call Right, the Option Purchase Price will be paid in cash."

34.    Combining those two features, economically, it was almost as if the put/call provision was essentially a deferred purchase obligation for DMC to buy the remaining 40% of Arcadia that it didn't already own from Munera because, from DMC's perspective, while *DMC's call* option did not require it to buy the 40% of Arcadia from Munera (because a call option gives the holder the right but not the obligation), *Munera's put* option (giving Munera the right but not the obligation to sell its 40% interest)—to which DMC was a potential obligor—could obligate DMC to buy the remaining 40% of Arcadia that it did not own on or after the third anniversary of the Arcadia transaction (i.e., December 23, 2024). In other words, the fact that Munera could exercise its put option in December 2024, created a massive looming obligation for at least $187.1 million (which was the floor value of Munera's put option) that DMC would ultimately have to meet—regardless of whether DMC desired to exercise its call option. DMC reported that the 40% minority interest of Arcadia (i.e., the put/call option) was valued at $187.76 million, as of December 31, 2023.

Case No. 1:24-cv-03387-GPG-CYC    Document 47    filed 06/23/25    USDC Colorado
pg 16 of 85


**C.    DMC's Acquisition Of Arcadia Created A $141 Million Goodwill Asset On DMC's Balance Sheet**

35.    Whenever a public company acquires another entity for more than the target's book value, a new asset called "goodwill" is created.[2]  Goodwill is an intangible asset that constitutes the portion of the purchase price above the net fair value of all of the assets purchased (i.e., the target company's book value). Because DMC paid $282.5 million for Arcadia, and recorded $141.2 million in corresponding goodwill, that means the book value of Arcadia at the time that DMC bought it was $141.3 million (because goodwill is just the difference between the purchase price and the book value, so rearranging those figures, purchase price minus goodwill equals book value).

36.    The underlying value of the goodwill asset often consists of, among other things, the acquired company's brand name, customer base, customer relations, employee relations, and/or proprietary technology.

37.    DMC first reported Arcadia's goodwill in the Company's 2021 Form 10-K, filed on March 1, 2022, signed by Defendant Kuta (when he was the Company's CFO), stating:

> Goodwill represents the amount by which the purchase price exceeds the fair value of identifiable tangible and intangible assets and liabilities acquired in a business combination. Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent

---

[2] Book value is a company's or an asset's worth, calculated by subtracting liabilities from assets.

discrete financial information is available that is reviewed by segment
management.

As of and for the year ended December, 31, 2021, all goodwill recorded
within the Consolidated Balance Sheet relates to the Arcadia acquisition.
Given the proximity of the acquisition date to the balance sheet date, a
quantitative impairment assessment was not deemed necessary of
performance. No goodwill was outstanding as of and for the year ended
December 31, 2020.

38.     Because goodwill is an intangible asset, its value is reported at the

acquisition price unless or until circumstances arise in which the intangible asset must be

written off, or "impaired." Such accounting differs from a tangible asset, such as a building,

which is depreciated over time (and thus a building's value typically changes on each

quarterly balance sheet). Goodwill is a static figure and does not rise (unless another

acquisition is made of course), but it can fall – if circumstances warrant writing the goodwill

down. The circumstances in which goodwill should be impaired are discussed below in

¶¶72-83. Importantly, because goodwill represents an amount *above* fair value of the

asset acquired, if the fair value of the asset were to become materially impaired, goodwill

would fall as well.

39.     From the date of the acquisition of Arcadia in December 2021 until the truth

was revealed (at the end of the Class Period), DMC continuously reported $141 million in

goodwill for Arcadia on DMC's consolidated balance sheet. DMC had no other goodwill

on its balance sheet, other than that in connection with the Arcadia acquisition, during the

Class Period.

40.     DMC described the conditions that it would test its goodwill (to determine if

an impairment may be warranted) as:

Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management. The Company's reporting units are each of the three operating segments disclosed in Note 10 within Item 8 — Financial Statements and Supplementary Data.

To test goodwill for impairment, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.

The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. In the Company's quantitative assessment, we estimate the fair value of **a reporting unit by using the income approach, specifically a discounted cash flow analysis**. A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.

As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the income approach. If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity

valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.[3]

41.    As shown above, when DMC's goodwill becomes impaired, the amount of the resulting impairment reduces the goodwill asset on DMC's balance sheet, which has a direct and corresponding effect on earnings. Put differently, if goodwill is artificially overstated (i.e., it should be impaired, but it is not), that overstatement will also, necessarily, overstate earnings for all periods during which goodwill is overstated but not impaired.

### D.    Shortly After Acquiring Arcadia, Macroeconomic Headwinds Began To Pressure Arcadia's Business

42.    Given Arcadia's business model, with direct exposure to the construction market, Arcadia was highly susceptible to rising interest rates. And because DMC bought Arcadia in late 2021, the timing of that purchase could not have been worse because interest rates began to surge alongside the inflationary pressures that followed the global pandemic.

---

[3] Throughout the Complaint, all emphasis is added unless otherwise noted.



43.     As shown above, mortgage rates hit generational lows during 2021, but began a sharp and sudden increase just as the Arcadia Acquisition was closing. That spike in interest rates, beginning in 2021 and 2022 served as a headwind for the construction industry, including for Arcadia. Indeed, one of Arcadia's publicly-traded competitors, Jeld-Wen, recorded a $54.9 million interim goodwill impairment during the third quarter of 2022 to its European segment, reflecting, among other factors, "increasing interest rates, persistent inflation, and operational inefficiencies attributable to ongoing global supply chain disruptions." Jeld-Wen would record two more goodwill impairments during 2024 (one for its European segment, and one for its North American segment), which were also attributed in part to rising interest rates.

44.     These inflationary headwinds, supply chain disruptions, and higher interest rates began to impact Arcadia. For instance, while Arcadia's Q2 2023 reported revenue exceeded guidance by 2.1%, by Q3 2023, Arcadia missed its revenue guidance by 5.4%, and by Q4 2023, it missed its guidance by 5.6%. Worse, it was missing such guidance on lower and lower targets: Arcadia's Q3 2023 revenue was $71.5 million, or 11% lower than the prior year; and Q4 2023 revenue was $67.9 million, 9% lower than the prior year.

Arcadia's full year 2023 revenue was just below its full year 2022 revenue, dipping 0.2%, as compared to the 13% average compound growth that Arcadia experienced before DMC bought it. Yet, unlike Arcadia's competitor, Jeld-Wen, Arcadia recorded no goodwill impairment during 2022 or 2023. By keeping Arcadia's goodwill valued at the same level as it was before the macroeconomic headwinds emerged, Defendants implicitly signaled to investors that the future stream of cash flows that Defendants projected to value Arcadia's goodwill under the income approach, was robust enough to offset both declining revenue and rising discount rates (otherwise the goodwill would have been impaired).

45.     By Q1 2024, Arcadia's reported revenue fell to $61.9 million, a 23% decline from the prior year, and an 8.9% quarter-over-quarter decline, and a continuation of the downtrend that began in Q2 2023. Arcadia's Q1 2024 revenue missed its guidance by 10.3%, and Arcadia's Q1 2024 EBITDA fell 44% from the prior year. And once again, as of Q1 2024, DMC reported the same $141 million of goodwill (all of which was associated with Arcadia) on its balance sheet for Q1 2024.

46.     As DMC's primary and largest division, Arcadia contributed significantly to DMC's net sales and gross profits leading up to the Class Period. During the years ended December 31, 2023 and 2022, Arcadia represented approximately 42% and 46% of DMC's consolidated net sales, respectively; DynaEnergetics represented approximately 44% and 40%, respectively; and NobelClad represented approximately 15% and 14%, respectively. For 2023, the Company reported gross profits of $92.2 million for Arcadia; $86.7 million for DynaEnergetics; and $33.5 million for NobelClad. And for 2023,

Arcadia's Adjusted EBITDA of $29.7 million comprised around 30% of DMC's total Adjusted EBITDA of $96.0 million.

47.     Further, Arcadia accounted for all of the goodwill on DMC's balance sheet, which the Company reported as $141.7 million as of December 31, 2023.

**E.     Despite Worsening Results And Growing Economic Headwinds, Defendants Continued To Report Robust And Unchanged Levels Of Goodwill For Arcadia, And Overstated Net Income**

48.     Notwithstanding the above worsening in Arcadia's performance relative to guidance, and the macroeconomic headwinds that prompted Arcadia's competitor, Jeld-Wen, to recognize a goodwill impairment, Defendants still reported Arcadia's balance sheet as having unchanged goodwill of $141 million. For instance, in Q1 2024, even after Arcadia's *third quarter in a row* of missing revenue guidance, Defendants again reported a $141.7 million goodwill asset on Arcadia's balance sheet—giving investors the misleading impression that Arcadia was seemingly weathering the worsening conditions. That endorsement of goodwill was an implicit message to investors that Arcadia still had substantially similar long-term business prospects as it did when DMC first bought it (when interest rates were much lower), otherwise it would have been impaired.

49.     In other words, because Defendants had told investors that DMC valued Arcadia using the income approach, and because the income approach reflects the summation of projected future cash flows, by maintaining Arcadia's goodwill at the same $141.7 million level, Defendants implicitly told investors that Arcadia's worsening business (e.g., missing revenue guidance for three quarters in a row as of Q1 2024) was only temporary—because when Arcadia was acquired, revenue was growing an average

13% per year, yet by Q1 2024, revenue had fallen 23% from the prior year. By not impairing goodwill in Q1 2024, Defendants implicit message to investors was things are going to get better—because if that were not the case, Arcadia's goodwill would have been impaired by the end of Q1 2024.

50.     But that goodwill representation was false because, as Defendants would later admit, the reasons that they gave when they belatedly impaired Arcadia's goodwill (in Q3 2024) existed by the end of Q1 2024 (discussed further below in ¶¶108-130).

51.     As Defendants acknowledged in DMC's Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on February 23, 2024 (the "2023 10-K"), "[i]f the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted."

52.     In other words, overstating goodwill necessarily overstates earnings during every period that goodwill is overstated because goodwill impairments reduce pre-tax income, dollar-for-dollar.

53.     DMC's goodwill was impaired by Q1 2024, yet Defendants reported both Q1 2024 and Q2 2024 goodwill as $141.7 million, thus materially overstating assets, equity, and net income.

**F.     Defendants Cannot Disclaim Knowledge Of DMC's Obligation To Impair Arcadia's Goodwill Given Defendants' Focus On Arcadia, Installation Of Experienced Management In Key Positions, And Design Of ERP Systems To Better Monitor Arcadia**

54.     Defendants were keenly focused on Arcadia during the Class Period and had the people and systems in place to monitor it—in real time. Indeed, Defendants both

implemented an Enterprise Resource Planning ("ERP") system and installed executives with knowledge of finance and accounting at key positions that oversaw Arcadia's worsening performance.

55.     Following the acquisition of Arcadia, but before the Class Period began, DMC announced in a press release on February 24, 2022, that DMC would be implementing several initiatives that included the "implementation of a new enterprise resource planning (ERP) system."

56.     Among other things, an ERP system creates a centralized database for all business information and facilitates the data flow between various departments.

57.     In January 2023, DMC sought to "accelerat[e] the integration and capacity expansion of Arcadia," and evaluate and develop new operating strategies for its three business units, which included the appointment of new executive management at the Company. Accordingly, on January 5, 2023, DMC announced that James Chilcoff ("Chilcoff") had been hired as President to lead Arcadia. Prior to joining DMC, Chilcoff had been with Mohawk Industries as president of its wood and laminate flooring division overseeing five manufacturing plants. The DMC press release stated:

> "[Chilcoff] is an accomplished leader in the building products industry," said Kevin Longe, president and CEO of DMC. "His extensive background in operations, manufacturing, sales, supply chain, finance and product-line management will be invaluable as Arcadia continues to streamline operations, increase production capacity and expand the markets for its commercial exterior, commercial interior and high-end residential product lines."

58.     Less than two weeks later, on January 17, 2023, DMC announced another management change when it announced that Kevin Longe, then president and CEO of

DMC, would be stepping down "effective immediately." Longe had served as DMC's president and CEO since March 2013, so most of his experience leading up to the Arcadia acquisition was in DMC's other two businesses, i.e., not Arcadia (because Arcadia was not acquired by DMC until late 2021). The Company further announced the appointment of Defendant Kuta (who had been serving as DMC's CFO since 2014) and David Aldous ("Aldous," DMC's Chairman of the Board) as interim co-CEOs of DMC. The press release further quoted Defendant Kuta stating:

> "We are laser focused on enabling each of our businesses to achieve their growth objectives, deliver industry leading margins and improved free cash flow. Our highest priorities include accelerating the integration of Arcadia, strengthening the profitability of DynaEnergetics, achieving commercial success with NobelClad's new products, and improving DMC's cash flow through more effective working capital management and targeted cost reductions."

59.    On February 23, 2023, the Company updated progress on its ERP system, and confirmed that "Arcadia has made significant progress implementing its new ERP platform, and the first phase of the project should go live during the second quarter [of 2023]."

60.    Five days later, on February 28, 2023, Defendant Walter, who was hired the month before as the Senior Vice President of Finance for DMC, was appointed as the Company's CFO.

61.    The day after Walter was installed as CFO, on March 1, 2023, Defendant Seger was appointed as the Company's Chief Accounting Officer. Defendant Seger previously served as the Company's Vice President of Finance Integration since January 2022, with the primary responsibility of managing the coordination of significant financial

activities relating to Arcadia. Before that, Seger spent 10 years at EY, which was Arcadia's auditor.

62. On August 7, 2023, the Company announced that Defendant Kuta had been appointed as DMC's President, CEO and director, "effective immediately." The press release quoted Aldous as stating: "Mike [Kuta's] leadership skills, strategic thinking, and deep knowledge of DMC's businesses and culture made it clear he was the ideal person to lead the Company. The [B]oard and I look forward to supporting Mike [Kuta] and his leadership team as they aggressively work to execute on DMC's strategy and move the Company forward."

63. In parallel with DMC's management changes, many of whom had accounting backgrounds, Defendants continued touting their progress on the Company's ERP system. For instance, on November 2, 2023, in the Form 10-Q for the third quarter of 2023, the Company confirmed that "Phase one of a new enterprise resource planning (ERP) system **went live in July 2023**, and is expected to enhance operating efficiencies **and the internal control environment** throughout Arcadia."

64. Also on November 2, 2023, during a call with investors and analysts Defendant Walter explained that Arcadia's ERP system was improving internal controls by allowing Defendants to have "better controls and **better visibility into data**" at Arcadia, including as to inventory, material costs, customers, and sales. Defendant Walter further stated that "we think that [the ERP] is going to provide or prevent any type of margin leakage between changes in aluminum costs and our ability to pass that through to customers. But another benefit that we're really excited about is it should also allow us

to be more efficient from an inventory turn standpoint. So if you think about our business model, we've got a hub and satellite type of structure with this new ERP system, we're going to have a **better understanding of where that inventory is**, how it's turning at the different satellites, and how we can transfer it from maybe 1 satellite where it's moving slower into another one where it's moving, faster."

65.    On November 13, 2023, the Company announced that James O'Leary ("O'Leary") had been appointed to be a director. The press release quoted Aldous, the Company's Chairman, as stating: "Jim [O'Leary] brings a wealth of relevant experience and expertise to the DMC board, and we are thrilled to welcome him as a new director. His insights and guidance will be invaluable as DMC continues to execute its strategy."

66.    Following months of communicating to investors that Defendants had better visibility into Arcadia, and following executive changes that installed three executives with deep experience in accounting,[4] on January 29, 2024 (the start of the Class Period), DMC announced that Arcadia would be the future of the DMC. More specifically, the January 29, 2024 press release announced that the Company had initiated "a review of strategic alternatives for it DynaEnergetics and NobelClad businesses" that could include a sale, merger, or other business combinations of the two *other* divisions. The message was clear: Defendants had invested into gaining real time insight into Arcadia, and they liked what they saw. Defendants described Arcadia as the Company's "core division" and was "taking a very focused approach toward maximizing [Arcadia's] differentiated business

_____

[4] Defendants Kuta, Walter, and Seger all have accounting degrees, MBAs, and have earned the CPA designation. *See* below at ¶¶157-158.

model and capitalizing on growth opportunities within it large addressable markets."

Defendants' statements affirmed to investors that DMC's focus was on Arcadia as its core

division. And because DMC had spent the past twelve months improving visibility into

Arcadia and was now being led by CPAs, the fact that Defendants would sell DMC's other

two business segments to focus on Arcadia was an implicit message to investors that

Arcadia's business was strong: because no reasonable investor would expect a company

to sell two-of-three business to focus on the worst performing business.

67.    Following the Company's announcement about focusing on Arcadia,

Defendants continued to reiterate the benefits of its ERP system. For instance, in the

2023 10-K, the Company stated:

> We expect ***Arcadia Products to be the primary driver of DMC's future*** financial and operational growth, reflecting its large addressable market and differentiated business model. Arcadia Products is investing in new digital technologies and manufacturing capacity to facilitate its expansion. Phase one of a new enterprise resource planning (ERP) system went live in the third quarter of 2023 and is enhancing operating efficiencies and ***the internal control environment***. Additional aluminum painting capacity was added in the second half of 2023, and the business expects further expansions in painting and anodizing capacity in 2024.

68.    On May 2, 2024, the Company filed its Form 10-Q for First Quarter of 2024

("Q1 2024 10-Q"), reiterating that Arcadia' ERP System was "enhancing operating

efficiencies and the internal control environment."

69.    During a call with investors and analysts on May 2, 2024, Defendant Kuta

stated that "We're actually getting ***a lot of good visibility now*** out of our ERP system."

70.     Then, on August 1, 2024, the Company filed its Form 10-Q for Second Quarter of 2024 ("Q2 2024 10-Q"), again reiterated that Arcadia's ERP system was "enhancing operating efficiencies and the internal control environment."

**G.     Defendants Improperly Delayed Recognizing A Goodwill Impairment Charge For Arcadia**

71.     Led by CPAs and armed with near real-time visibility into Arcadia's business, during the Class Period, Defendants represented that DMC's financial statements were prepared in conformity with GAAP. These representations were materially false and/or misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of more than $141 million for the Arcadia business, thereby falsely inflating the Company's income, assets, and equity during the Class Period, until DMC belatedly recognized the charge on November 4, 2024.

72.     GAAP is a series of authoritative standards (set out by policy boards, including the Financial Accounting Standards Board, or "FASB") that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, accurate, consistent, and comparable. FASB's Accounting Standards Codification ("ASC") is the current source of U.S. GAAP.

73.     Compliance with GAAP is a basic fundamental obligation of publicly traded companies, like DMC. Indeed, as set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

74.    Goodwill is an intangible asset subject to GAAP. ASC 805-10-05-4 "requires that a business combination be accounted for by applying what is referred to as the acquisition method."  ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Goodwill is calculated by subtracting the fair value of the identifiable net assets acquired from the purchase price. ASC 805-30-30-1. This is also known as the purchase price actually paid (i.e., the market value) minus the book value of the entity.

75.    Once goodwill is added to an acquiring company's balance sheet, it just sits there as a static figure (an asset), unless it is later written off. And because goodwill is a static figure, issuers are obligated to value it to determine whether the reported value on the balance sheet still reflects reality. To value goodwill, an "income approach" or a "market approach" can be used.

76.    EY, DMC's auditor, explains that "drivers of fair value for a reporting unit that is valued using the income approach may be cash flow projections, terminal growth rate or the weighted-average cost of capital (WACC), whereas the drivers of fair value for a reporting unit that is valued using the market approach may be applicable industry

multiples such as multiples of revenue or earnings before interest, taxes, depreciation and amortization (EBITDA)." [5]

77.     In other words, unlike the income approach, the market approach includes observable inputs of fair value, including but not limited to non-binding offers received from third-parties and comparative market multiples.

78.     If, after using either the income or market approach, an issuer determines that its goodwill exceeds its carrying value (i.e., if its net present value is less than that which is being publicly reported), the issuer must write-off that goodwill down to the level of market value and record an impairment charge.

79.     A goodwill impairment charge is an acknowledgement that an acquired business is no longer worth as much as it was at the time of the acquisition. Goodwill impairments directly reduce net income on the income statement; and also reduce assets and shareholders equity on an issuer's balance sheet.

80.     GAAP requires that companies test their goodwill at least once per year. But, if certain indicators, or "triggering events," arise that suggests goodwill should be tested more than once per year, companies must make such an interim test.

81.     According to the EY Advisory, under ASC 350-20-35-30, a number of non-exhaustive factors exist that establish whether circumstances have changed such that an additional goodwill test should be conducted.

_____

[5] *See* EY's June 2024 Financial Reporting Developments: "Intangibles – goodwill and other" (hereinafter, the "EY Advisory").

82. Some events that may indicate that an interim impairment test is necessary include:

    i. Negative current events or long-term outlooks for specific industries impacting the company as a whole or specific reporting units

    ii. Not meeting analyst expectations or internal forecasts in consecutive periods, or downward adjustments to future forecasts

    iii. Planned or announced plant closures, layoffs, or asset dispositions

    iv. Market capitalization of the company below its book value.

83. Additionally, the EY Advisory cautions that the SEC also considers certain factors that may lead to a conclusion that an interim goodwill testing should take place. These factors include, *inter alia*, (1) downward revisions to forecasts; (2) a decline in market capitalization below book value; (3) industry trends; and (4) restructuring actions or plans. The EY Advisory adds that "Situations may arise where companies may need to consider performing an interim goodwill impairment test even though they may have recently performed their annual assessment."

**H.**    **Defendants Used DMC's Overstated Earnings And Balance Sheet To Secure Desperately Needed Capital For The Looming Put-Call Obligation**

84. Amidst Arcadia's declining financial performance, on February 6, 2024, DMC increased its borrowing capacity from a $50 million revolving facility to a $200 million facility. Along with a $100 million term loan, the Company's total borrowing capacity increased from $200 million to $300 million. The Company's first amended credit facility

specifically provided for DMC's acquisition of its remaining 40% of Arcadia under the put/call provision.

85.     DMC's credit facility was backed by *all* of the Company's assets. As discussed above, before it was entirely written off, DMC's goodwill was a $141 million asset. In other words, Defendants gained financing that was secured, at least in part, by assets that were, as of the end of Q1 2024, overstated.

**I.     The Truth Emerges**

86.     On October 21, 2024, after market close, the Company issued a press release entitled, "DMC Global Provides Business and Strategic Review Update, Announces Governance Changes," which it also filed on Form 8-K with the SEC, and which stated in pertinent part:

> DMC Global [] today provided an update on its business conditions and revised its third quarter financial guidance.  The Company also commented on its strategic review process and announced governance changes. DMC said third quarter sales are expected to be approximately $152 million versus prior guidance of $158 million to $168 million.  The results reflect weaker-than-expected sales at both Arcadia Products ("Arcadia"), DMC's architectural building products business, and DynaEnergetics, DMC's energy products business.
>
> Adjusted EBITDA* is now expected to be approximately $5 million versus prior guidance of $15 million to $18 million.  Third quarter results will include inventory and bad debt charges at DynaEnergetics totaling approximately $5 million, as well as lower fixed overhead absorption on reduced sales at both Arcadia and DynaEnergetics.
>
> **The Company said its third quarter financial results will include an approximate $142 million non-cash goodwill impairment charge associated with DMC's December 2021 acquisition of a controlling interest in Arcadia.  The charge reflects Arcadia's recent financial performance and near-term outlook. These factors, combined with the significant decline in DMC's market capitalization, led the Company to**

conclude that the goodwill impairment charge was appropriate at this time.

DMC president and CEO Michael Kuta, who is also leading Arcadia on an interim basis, said, "Arcadia's third quarter performance was affected by weak commercial and high-end residential construction activity, lower fixed overhead absorption, and supply-chain disruptions that impacted product availability."

87.    The Company also announced that "**it is no longer actively marketing DynaEnergetics and NobelClad**," ending the strategic review process which the Company announced at start of the Class Period on January 29, 2024.

88.    On this news, DMC common stock dropped more than 18%, from a $12.93 per share closing price on October 21, 2024, to a close of $10.57 per share the next day, on unusually high trading volume.

89.    Then, on November 4, 2024, after market close, the Company issued a press release entitled, "DMC Global Reports Third Quarter Financial Results," which it also filed on Form 8-K with the SEC, and in which it reported Q3 2024 sales of $152.4 million, a $159.4 million net loss (**inclusive of a $141.7 million goodwill impairment charge at Arcadia**), and adjusted EBITDA of $5.7 million. The press release further stated, in part:

At Arcadia, DMC's architectural building products business, persistent high interest rates have impacted sales to the high-end luxury home market and have resulted in continued soft commercial construction activity. ***Under the direction of a new interim business president, Arcadia is executing a series of internal initiatives designed to strengthen sourcing and supply chain functions; improve sales, inventory and operations planning processes; and more effectively leverage Arcadia's enterprise resource planning system.*** The business is also reviewing certain product lines that have not consistently met profitability targets.

Arcadia's improvement initiatives are being led by interim president Chris Scocos, who joined the business in September 2024 with a 25-year track record of implementing lean manufacturing, process improvement and operational excellence programs for industrial manufacturing businesses across a broad range of industries, including building materials and industrial manufactured products.

90.     On November 4, 2024, the Company also filed its Form 10-Q for Third Quarter of 2024 ("Q3 2024 10-Q"). Therein, Defendants revealed for the first time that they had *changed DMC's valuation method* of goodwill from the "income approach" to the "market approach."

91.     More specifically, Defendants admitted that for the "quantitative goodwill impairment test," the Company "utilized the **market approach** to estimate the fair value of the Arcadia Products reporting unit, but also considered the income approach to validate the results."[6] Never before had Defendants indicated that goodwill could be valued under a market approach, or that its valuation methodology was subject to change.

92.     The change in valuation methods for goodwill was material because, among other reasons, under a market approach, which is based on "observable inputs of fair value, including but not limited to non-binding offers received from third-parties and comparative market multiples", investors could have better tracked DMC's goodwill had they been informed that these "observable inputs" could affect DMC's goodwill. Significantly, the only third-party non-binding offer that was made publicly occurred during

---

[6] The income approach estimates the fair value by discounting the reporting unit's estimated future cash flows using an estimated discount rate, or expected return, that a marketplace participant would have required as of the valuation date.

Q2 2024, not Q3 2024 when the impairment was taken.[7] And if investors knew at the time that the third-party offer made in Q2 2024 could have prompted an impairment of DMC's goodwill, they could have responded accordingly. But Defendants kept investors in the dark. Had Defendants disclosed that goodwill could be valued under a market approach, investors would not have faced the same level of information asymmetry that is inherent in the income approach.

93.    Defendants continued, "[b]ased on the results of our quantitative goodwill impairment test, we recorded a $141,725[,000] impairment charge to goodwill during the three and nine months ended September 30, 2024, which is included in 'Goodwill impairment' in our Condensed Consolidated Statements of Operations."

94.    Later, on November 4, 2024, the Company held a conference call with analysts and investors to discuss its Q3 2024 results. Defendants Kuta and Walter, as well as O'Leary, DMC's Executive Chairman, and Geoff High, DMC's Vice President, Investor Relations & Corporate Communications, participated on the call, during which Defendant Kuta stated in part:

---

[7] On May 31, 2024, Steel Connect, Inc. (together with its affiliates, "Steel") sent DMC a non-binding offer to purchase DMC by acquiring all outstanding shares of DMC not already owned by Steel for $16.50 per share in cash (Steel disclosed that it owned 1,973,039 shares at the time). The offer letter was filed with the SEC on June 13, 2024. By comparison, when DMC's acquisition of Arcadia closed, on December 23, 2021, DMC's share price closed at $40.82 per share. In other words, on May 31, 2024, third-party, Steel, believed that DMC's total value was worth *59.5% less* than it was when DMC acquired Arcadia. Yet, with that information, Defendants represented that Arcadia's goodwill (in Q2 2024) was worth the same as it was in 2021—as if a 59.5% decline in its entire business had not happened.

Arcadia, our architectural building products business, reported third quarter sales of $57.8 million, down 17% sequentially and down 19% versus the third quarter last year. Arcadia's third quarter adjusted EBITDA margin was 5.8%, down from 17.8% in the second quarter and 18.8% year-over-year. The decline principally reflects lower fixed cost absorption on reduced sales.

Persistently high interest rates have negatively affected sales to Arcadia's high-end luxury home market, and also slowed commercial construction activity in several Arcadia's regional markets. Arcadia's third quarter is also impacted by supply chain disruptions that limited product availability.

We recently named Chris Scocos as our new Interim President at Arcadia. He brings an extensive background in lean manufacturing, operational excellence, and improving plant productivity. ***His immediate focus is on strengthening sourcing and supply chain functions, improving sales, inventory, and operations planning processes, and more effectively leveraging Arcadia's ERP system.*** We also are reviewing certain product lines that have not consistently met our profitability targets.

95.    On the call, O'Leary (who would soon become DMC's interim president and CEO) and Defendant Kuta had the following colloquy with analyst Gerry Sweeney at Roth Capital Partners:

Analyst Gerry Sweeney, Roth Capital Partners:

I was hoping maybe we could discuss a little bit more about the work they want to do at Arcadia to improve operations. And then as maybe a subset to that question, are the systems in place to manage that? You talked about the ERP explicitly leveraging that, but just curious if all the systems are in place and then to go into a little bit more detail on maybe where some of the low-hanging fruit is or what have you, and what's the path forward on that front?

James O'Leary:

I'm going to turn it over to Mike [Kuta] on some of the specific initiatives that he and Chris [Scocos] have been initiating, accelerating, and I think pushing forward with the right skill sets for really the first time since the acquisition.

***A macro comment, which I think, again, we might have underestimated and certainly contributed to the goodwill write-off, we bought a family***

***business.*** We bought a family business that had excellent commercial people. They understood pricing. They understood their markets.

They had the right titles, the right org charts, the right people that at first blush looked like they'd be able to handle the amount of change that comes with being a public company. And the digestion issues around ERP, putting in compliance around being a public company, making sure you've got, not just people who have the titles of VP of supply chain, but actually know what that means, particularly in a post-COVID environment.

***We underestimated the challenges there.*** A couple of -- we took a few calls after our last press release, and to me, these are things that are simple to diagnose, easy to spot, not really wildly difficult to fix if you have people with the right skill set, but take time.

***And putting the ERP system on with the aggressiveness of the implementation, dealing with upgrading people happens with every family company acquisition I've ever seen, and really dealing with just the robustness of the systems and the people, exactly what you think in a family company.***

***The answer was no, and that led to the write-off.*** We've spotted, diagnosed, have fixes in for all of them. Takes a little bit of time. You'd feel a lot better if it was at a time when elections behind us, whatever -- whichever party puts in place, is going to help put a little bit more wind in the sales of the housing market more broadly and construction.

***And interest rates being a little bit lower would help the high-end residential market***. But that said, while it would be nice to have the wind in our sales, we recognize we don't. So we've got initiatives underway that are very specifically targeted to some of the things we probably could have been a little bit more respectful from the get-go on.

Mike [Kuta], do you want to talk about some of the specific initiatives?

Defendant Kuta:

Yes, [analyst] Gerry [Sweeney]. So a couple of things that we're working on with the team relate to supply chain and sourcing, so we can do a better job on both supply chain sourcing and planning, as well as S&OP processes.

So one of the gaps we have there is demand planning and knowing what we need when we need it. So that was some of my comments around the

supply chain disruption.  So we've got programs we're putting in place there, working on.

The other thing is there's the other item in the back-end of our businesses, there's some improvements we can certainly make in our finishing operations. So and a lot of that gets to -- you get your supply chain de-bottle neck and you've got to get scheduling right and finishing up.

So a lot of work we're doing on that to improve lead times, on-time and in full, deliveries to customers, making sure we've got shelf stocked with product, making progress, but a ways to go.

So there's good things happening, but it's going to take some time, as Jim [O'Leary] mentioned, to sort that out.

96.     Then, later in the November 4 call, O'Leary had the following colloquy with

analyst Ken Newman at KeyBanc Capital Partners:

Analyst Ken Newman, KeyBanc Capital Partners:

Okay. Maybe switching over to the restructuring actions you're taking, I -- one, I thought **there was already an ERP implementation already kind of in place at Arcadia**. So, when you talk about the sourcing initiatives, just what's kind of involved with that? And just what's -- is there any way to kind of size the cash cost that's going to be associated with some of these restructuring actions you're taking, and how long you expect that payback to be?

James O'Leary:

So, these are additions. We haven't talked specifically about any restructuring, **but, certainly everything's on the table when you have results like we've had**, but there's nothing that we're specifically announcing.

All the additions are top grading, upgrading people. You're 100% correct. We've talked about ERP in the past, but it certainly could have gone smoother, and really holding people accountable and getting some additional resources in. The cash cost, it's kind of part of doing business when you're top grading and adding people, like in the case of Chris [Scocos]. Chris [Scocos] is replacing a guy that we let go who had a comparable salary, so it's not a huge incremental cost that we'd put a payback on.

97.    Following the November 4, 2024 disclosures, the price of DMC common stock dropped another 6%, from a $9.84 per share closing price on November 4, 2024, to a close of $9.25 per share the next day, on high trading volume.

**J.    Post-Class Period Events**

98.    On November 13, 2024, the Company announced that Defendant Kuta would "retire" as the Company's President, CEO, and as a member of the Board, effective November 29, 2024, and that O'Leary would assume the role of interim president and CEO.  On June 23, 2025, the Company announced O'Leary's appointment as president and CEO on a permanent, non-interim basis, effective July 1, 2025.

**V.    ADDITIONAL SCIENTER ALLEGATIONS**

99.    Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew or recklessly disregarded that they were misrepresenting DMC's financials, including its reported goodwill, total assets and equity, and net income. The allegations below further support such an inference of scienter.

**A.    Defendants' Desire To Increase DMC's Credit Agreement By $100 Million To Gain Access To Desperately Needed Financing Provided Motive**

100.    As discussed above, at the time of the Arcadia Acquisition, the put/call feature created a looming cash need for DMC because the put/call feature allowed Munera to "put" its 40% interest in Arcadia to DMC, no matter how bad Arcadia or DMC's business was performing.

101.    By Defendants' later admissions, that looming cash need created the possibility of "an impending liquidity issue" if financed in cash or "significant equity dilution"

if financed in stock, as observed by O'Leary during the Company's Q4 2024 earnings call on February 24, 2025. As O'Leary put it, that put/call liquidity risk was "the number one concern many of [DMC's] shareholders correctly raised" when he took over as DMC's CEO in November 2024.

102.    The put/call exercise was initially intended to occur by the third anniversary of the Arcadia Acquisition, i.e., December 23, 2024. And at least 20% of the put exercise would need to be paid in cash (by DMC to Munera, the Arcadia minority interest holders). At year-end 2023, DMC reported the floor value of the put option as $187.8 million, meaning, if Munera exercised its put option at the end of 2024, DMC would have to pay $187.8 million to Munera, of which 20% (or $37.5 million) would need to be paid in cash.

103.    DMC did not have available funds on hand to pay the $187.8 million exercise price in cash coming into 2024. As of year-end 2023, DMC had roughly $31 million of cash on its balance sheet, and another $12.6 million of marketable securities. It also had $50 million of borrowing capacity available under its then-existing revolving credit facility, thus bringing total theoretical sources of funds to a total of $93.6 million as of year-end 2023.

| *DMC Sources of funds*  ($ 000) as of 12/31/2023 | |
| --- | --- |
| Cash | 31,040 |
| Marketable securities | 12,619 |
| Revolving Credit Facility | 50,000 |
| Total: | 93,659 |
| | |
| Floor value of put option: | $187,760 |
| | |
| Shortfall: | (94,101) |

104.    Accordingly, Defendants faced an approximate $94 million cash shortfall if Munera exercised its put option and DMC elected to pay in cash. That $94 million shortfall would thus need to be covered by DMC shares, which would have massively diluted DMC's stock. For instance, based on DMC's share price on December 29, 2023 of $18.82 per share, to raise $94.1 million, DMC would need to issue roughly 5 million shares, as compared to the 19.5 million shares that it had outstanding as of December 31, 2023 (or a 26% increase). And, because DMC could not have realistically put every single dollar that it had into the Arcadia exercise – because it had other cash obligations (e.g., payroll, accounts payable, etc.), the true cash shortfall coming into 2024 was significantly greater than the $94.1 million cited immediately above.

105.    As a result, DMC announced on February 6, 2024, that it increased its borrowing capacity from a $50 million revolving facility to a $200 million facility. Along with a $100 million term loan, the Company's total borrowing capacity increased from $200 million to $300 million. The Company's first amended credit facility specifically provided for DMC's acquisition of its remaining 40% of Arcadia under the put/call provision.   In exchange for the increased borrowing, DMC's lenders demanded a higher rate of interest. DMC's interest rates on its credit facility increased based on DMC's leverage ratio, as shown by the redline to the credit agreement that was filed with the SEC on February 7, 2024 (redlines in original):

(b)    commencing with the Consolidated financial statements of DMC Global for the fiscal year ending December 31, ~~2021~~2023, the number of basis points (depending upon whether Loans are SOFR Rate Loans or Base Rate Loans) set forth in the following matrix, based upon the result of the computation of the Leverage Ratio as set forth in the Compliance Certificate for such fiscal period and, thereafter, as set forth in each successive Compliance Certificate, as provided below:

| Leverage Ratio | Applicable Basis Points for SOFR Loans | Applicable Basis Points for Base Rate Loans |
|---|---|---|
| ~~Greater than or equal to 3.00 to 1.00~~ | ~~300.00~~ | ~~200.00~~ |
| Greater than or equal to 2.50 to ~~1.00 but less than 3.00 to~~ 1.00 | ~~250.00~~325.00 | ~~150.00~~225.00 |
| Greater than or equal to 2.00 to 1.00 but less than 2.50 to 1.00 | ~~225.00~~300.00 | ~~125.00~~200.00 |
| Greater than or equal to 1.50 to 1.00 but less than 2.00 to 1.00 | ~~200.00~~275.00 | ~~100.00~~175.00 |
| Greater than or equal to 1.00 to 1.00 but less than 1.50 to 1.00 | ~~175.00~~250.00 | ~~75.00~~150.00 |
| Less than 1.00 to 1.00 | ~~150.00~~225.00 | ~~50.00~~125.00 |

Source: **DMC's February 7, 2024 Form 8-K (ex. 10.10).**

106.    Thus, given the timing of the February 6, 2024 amended borrowing facility, the negotiation of which was presumably ongoing during Q1 2024, Defendants had a strong motive to avoid impairing its goodwill because a massive impairment might have jeopardized those desperately needed financing discussions because, among other reasons, the amended credit agreement was secured *by the assets of the Company*. And, at year-end 2023, DMC's goodwill was a $141 million asset (out of total DMC assets of $884.5 million) that they would not have otherwise been able to borrow against. Moreover, impairing 100% of DMC's goodwill just weeks after securing such a facility might have jeopardized relationships with DMC's lenders – who may have felt blindsided by such a scenario. Thus, Defendants had a strong motive to avoid taking the impairment during Q1 2024.

107.    Separately, the February 6, 2024 amendment to DMC's credit agreement also created a direct and measurable change to one of the inputs that drives the value of Arcadia's goodwill: an increase to DMC's weighted-average cost of capital ("WACC"), which is used to discount the projected cash flows under the income approach. Increases to DMC's cost of debt directly increases its WACC. And the higher the WACC, the lower the present value of Arcadia's future cash flows under the income approach for valuing Arcadia's goodwill. That increased cost of borrowing was tied to a base rate, which itself had been increasing in the years since DMC acquired Arcadia. Thus, DMC's WACC had increased materially since its acquisition of Arcadia, and the increased borrowing costs in Q1 2024 would have even further lowered the carrying value of Arcadia under the income approach to valuing its goodwill (as DMC was purportedly using to value DMC's goodwill as of Q1 2024).

### B. Red Flags Informed Defendants Of A Need To Impair Arcadia's Goodwill By The End Of Q1 2024 At The Latest

#### 1. The Reasons That Defendants Gave For Arcadia's Q3 2024 Goodwill Impairment Existed In Q1 2024

108.    Defendants claim the impairment was taken because of Arcadia's (i) recent financial performance and (ii) near-term outlook. According to Defendants, those factors, combined with the significant market capitalization decline in DMC, led the Company to conclude that Arcadia's goodwill should be written off—in its entirety—as of Q3 2024.

109.    However, Defendants' stated reasons for impairing DMC's goodwill in Q3 2024 also existed as of Q1 2024 (at the latest), thus establishing that the impairment should have been taken no later than Q1 2024.

110.    For instance, by Q1 2024, Arcadia had missed its projected revenue guidance for **three straight quarters**: in Q3 2023; Q4 2023; and Q1 2024.

111.    And as shown immediately below, by Q1 2024, Arcadia was missing such guidance on both (i) lower-and-lower guidance targets—which should have been easier to hit; and (ii) missing those lowered targets by higher-and-higher percentages.

| Reporting period | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 |
|---|---|---|---|---|
| Arcadia Revenue guidance ($ 000) | $75,000 - $80,000 | $73,000 - $78,000 | $70,000 - $74,000 | $67,000 - $71,000 |
| Reported revenue | $79,158 | $71,450 | $67,958 | $61,925 |
| Revenue shortfall[8] | -- | *-5.4%* | *-5.6%* | *-10.3%* |

112.    Arcadia's Q1 2024 reported revenue of $61.9 million missed the midpoint of the Company's guidance range of $67-$71 million by 10.3%. And by Q1 2024, Arcadia's reported revenue had fallen for **five consecutive quarters**:

| Reporting period | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 |
|---|---|---|---|---|---|
| Revenue | $80,338 | $79,158 | $71,450 | $67,958 | $61,925 |

113.    Arcadia's declining revenue, which began in Q1 2023, was precipitous and material. Arcadia's Q1 2024 revenue of $61.9 million represented **a 22.9% decrease** from Q1 2023. Arcadia's Q1 2024 revenue also represented a sequential (or quarter-over-quarter) decline of 8.9%. When Acadia's goodwill was initially calculated, revenue was *growing* 13% per year.

---

[8] Because DMC provided a range of revenue guidance (e.g., from $75 to $80 million for Q3 2023), the percentages used in this calculation compare the actual reported revenue to the mid-point of revenue guidance range.



Arcadia Reported Revenue
(in 000s)

$18.4 million decline, or 22.9%

114.    Arcadia's profitability, as measured by Adjusted EBITDA, showed a similar

pattern of consistent decline in reporting periods preceding Q1 2024.

| Reporting period | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 |
|---|---|---|---|---|
| Reported Adj. EBITDA | $9,982 | $8,060 | $5,530 | $3,540 |
| Quarterly decline | -- | *-18.5%* | *-31.4%* | *-36.0%* |



Arcadia Reported Adj. EBITDA
(in 000s)

64.2% decline since Q2 2023

43

115.    Arcadia's Q1 2024 Adjusted EBITDA fell **44%** year-over-year, to just $3.54 million. Since Q2 2023, Arcadia's Adjusted EBITDA fell a cumulative 64.2%. Yet as of Q1 2024, Defendants recorded DMC's goodwill at $141 million – the same levels as when Arcadia was *growing* revenue at 13% compounded annually.

116.    With revenue and Adjusted EBITDA being Arcadia's key metrics, as of Q1 2024, Arcadia's financial performance had worsened materially, and was (and had been) on a clear downward trend leading up to Q1 2024. The purported "recent financial performance" Defendants cited in Q3 2024 as prompting the impairment was not recent – it was a continuation of a well-defined trend that accelerated dramatically into Q1 2024 when the impairment should have been recorded.

117.    Given such performance, DMC's market capitalization correspondingly fell. At the time of the Arcadia Acquisition, DMC's market capitalization was approximately $688.5 million. By contrast, DMC's market capitalization stood at $382.2 million as of March 31, 2024. Thus, the cumulative decline in DMC's market capitalization since the time of the Arcadia Acquisition through the end of Q1 2024 was $306.3 million, or 44.4%. And because DMC paid $282.5 million for 60% of Arcadia, and because Arcadia was DMC's largest business, a $306.3 million decline in DMC's market capitalization, almost certainly meant that Arcadia's value had fallen as well. For instance, at the time of the acquisition, when DMC paid $282.5 million for Arcadia, that $282.5 million consideration comprised 41% of DMC's then market capitalization of $688.5 million ($282.5/688.5 = 41.0%). If that same proportion of Arcadia-relative-to-DMC was applied to DMC's $382.2 million market capitalization as of March 31, 2024, Arcadia's implied value would be

$156.7 million. By comparison, Defendants marked Arcadia's goodwill alone at $141 million as of March 31, 2024, which is nonsensical in comparison to Arcadia's market-implied valuation because it would essentially mean that the vast majority of Arcadia's market-implied valuation was made up of goodwill.

118.    In sum, the factors that Defendants cited to purportedly justify DMC's 100% goodwill impairment as of Q3 2024 — weakening financial performance and a significant market capitalization decline — *had already happened* by the end of Q1 2024. Thus, by Defendants own metrics, DMC should have impaired Arcadia's goodwill by Q1 2024.

> **2.    Any Incremental Deterioration Of Arcadia's Performance After Q1 2024 Was Negligible As Compared To The Deterioration That Occurred Up To And Including Q1 2024**

119.    As shown above, Defendants' explanation about Arcadia's so-called "recent financial performance" to purportedly warrant the impairment in Q3 2024 does not track the true timeline of the Company's actual financial performance. And while Arcadia's performance did worsen modestly after Q1 2024, any incremental worsening in financial performance was, in comparison, *far* smaller than the financial performance declines that existed as of Q1 2024.

120.    Indeed, the decline in Arcadia's quarterly revenue from Q1 2023 to Q1 2024 was $18.4 million, or 22.9%. Yet, the incremental decline in Arcadia's revenue from Q1 2024 to Q3 2024, was just $4.1 million, or 6.6%.



121.   So too with DMC's market capitalization decline (depicted immediately above), which Defendants also pointed to as prompting the impairment. Since DMC acquired Arcadia in December 2021, DMC's market capitalization fell a total of $434 million—from $688.5 to $254.5 million, as of September 30, 2024 (when the impairment was taken). But $306.3 million—*or 70.6%*—of that cumulative $434 million market capitalization decline had **already occurred** by March 31, 2024. And by May 6, 2024 (just after DMC reported Q1 2024 earnings), DMC's market capitalization fell to $267.5 million. So after DMC's Q1 2024 dismal earnings had been digested by the market and priced into DMC's shares, there was only a <u>$13 million</u> additional decline to reach DMC's $254.5 market capitalization as of September 30, 2024. Defendants' purported justification of a "recent" market capitalization decline cannot explain an impairment in Q3 2024 (and only Q3 2024) but not in Q1 2024.

122.    In sum, by many measures, there was a far greater decline in Arcadia's financial performance that occurred *leading up to and including Q1 2024*, than there ever was in between Q1 2024 (when the impairment should have been taken) and Q3 2024 when the impairment was belatedly recognized. Thus, the very reasons that Defendants cited for the impairment were present at the end of Q1 2024. And any modest and incremental weakening in Arcadia's financial performance metrics—particularly those that Defendants attributed to causing the impairment—between Q1 2024 and Q3 2024 would not justify a complete write-off of 100% of Arcadia's goodwill. At a minimum, Defendants' reasons for the impairment establish that at least a partial impairment should have occurred before Q3 2024. It is not as if Arcadia was a pharmaceutical business that suddenly lost FDA approval of its only drug during Q3 2024 (which theoretically could justify a sudden impairment of 100% of a business).

### 3.    Additional Indicators Suggested Interim Testing For Impairment Was Necessary

123.    As noted above, GAAP requires interim goodwill testing when certain indicators are present. Here, several red flags existed during the Class Period that should have prompted Defendants to impair Arcadia's goodwill as of Q1 2024.

124.    According to the EY Advisory, under ASC 350-20-35-30, examples of events that may indicate that an interim impairment test is necessary include:

      i.    Negative current events or long-term outlooks for specific industries impacting the company as a whole or specific reporting units

     ii.    Not meeting analyst expectations or internal forecasts in consecutive periods, or downward adjustments to future forecasts

      iii.    Planned or announced plant closures, layoffs, or asset dispositions

      iv.    Market capitalization of the company below its book value.

125.    Additionally, DMC's auditor, EY, cautions that the SEC also considers certain factors that may lead to a conclusion that an interim goodwill testing should take place. These factors include, *inter alia*, (1) downward revisions to forecasts; (2) a decline in market capitalization below book value; (3) industry trends; and (4) restructuring actions or plans. EY adds that "Situations may arise where companies may need to consider performing an interim goodwill impairment test even though they may have recently performed their annual assessment."

126.    Most of the above indicators were present here during the Class Period, thus necessitating an interim test of goodwill for impairment. For instance, industry factors suggesting interim testing was necessary include the rapid rise in interest rates that pressured the entire construction industry beginning in 2022 and 2023; and that Arcadia's competitor, Jeld-Wen, recognized an impairment in 2022, among others.

127.    Additionally, Arcadia failed to meet guidance expectations for revenue in consecutive periods: Q3 2023; Q4 2023; and Q1 2024. Q1 2024 was the *third consecutive* quarter that Arcadia missed revenue guidance. Arcadia also missed its Adjusted EBITDA guidance during Q1 2024. And the consecutive revenue shortfalls relative to guidance occurred in response to downward adjustments to forecasts.

128.    On January 29, 2024, the Company announced strategic alternatives and the hiring of financial advisors to potentially sell two business segments, which reflects

the type of contemplated "asset dispositions" that EY instructs is another indicator. Moreover, financial advisors engaged for a strategic review process typically prepare a sum-of-the-parts valuation analysis of each business segment on a standalone basis. Here, that standard process would have included a valuation of Arcadia. At a minimum, the financial advisors would have access to the specific observable market inputs that Defendants would use under the market approach.

129.    Moreover, roughly half-way through Q4 2023, DMC's market value fell below its book value, and remained there for the balance of 2023. And at ***no point*** during Q1 2024 did DMC's market value ever rise above its book value, as shown in the following chart:



130.    As a result, given all the above glaring red flags, the three CPAs who led DMC knew or were reckless in disregarding an urgent need to test Arcadia's goodwill as

of Q1 2024. So Defendants either did test for impairment in Q1 2024, and decided to knowingly overstate Arcadia's goodwill as of Q1 2024; or, alternatively, if they failed to test Arcadia's goodwill in Q1 2024, in spite of the above red flags, they were reckless for failing to do so. Either way supports a strong inference of scienter.

C.    **DMC's Admission That It Acquired Arcadia At A Peak Valuation Supports Scienter Given The Rapid Rise In Interest Rates That Preceded The Class Period**

131.    Under the income approach, Defendants are required to project cash flows of future years and discount those projected cash flows to present value, taking into account, among other things, the appropriate discount rate. The EY Advisory explains that "drivers of fair value for a reporting unit that is valued using the income approach may be cash flow projections, terminal growth rate or the weighted-average cost of capital (WACC)." Put differently, all of the aforementioned factors can impact goodwill valuation under the income approach. Accordingly, the sharp rise in interest rates that preceded the belated impairment (discussed above at ¶¶42-44) served as an additional red flag for a need to impair Arcadia's goodwill. Rising interest rates materially lowers the value of Arcadia's goodwill under the income approach, which is what Defendants claim to have used during Q1 2024, for at least two reasons: (1) higher interest rates decreased demand for construction products, which in turn reduced the projected cash flows of the construction industry, including for Arcadia (i.e., the numerator of the income approach); and (2) simultaneously increased DMC and/or Arcadia's WACC (i.e., the denominator).

132.    **The numerator**. Given Arcadia's exposure to the construction industry, its underlying business is sensitive to changes in interest rates. Higher interest rates

discourage capital investment and raise the cost of construction for Arcadia's customers who borrow to finance such projects. Higher interest rates thus operate as a demand headwind to Arcadia's business: the higher the rate, the stronger the headwind. So, under the income approach for valuing goodwill, the higher interest rates that preceded the Class Period should have prompted Defendants to consider whether the numerator in Arcadia's cash flow projections (which must be projected to value goodwill under the income approach) were overstating the value of goodwill recorded on DMC's books in connection with the Arcadia acquisition.

133.   **The denominator**. Yet even if higher rates had no impact to Arcadia's underlying business fundamentals, meaning even if they did not reduce future cash flows, rising interest rates still decrease the value of Arcadia's goodwill by the way the math works in discounting cash flows: the higher the interest rate, the lower the net present value of the cash flows received in the future. The table immediately below shows how changes in interest rates impact the valuation of a hypothetical stream of cash flows.

| | 2025 | 2026 | 2027 | 2028 | 2029 | Total NPV |
|---|---|---|---|---|---|---|
| Projected cash flow (undiscounted) | 29.95 | 29.95 | 29.95 | 29.95 | 29.95 | 149.75 |
| Discounted at 2.25% | 29.29 | 28.65 | 28.02 | 27.40 | 26.80 | 140.15 |
| Discounted at 5.25% | 28.46 | 27.04 | 25.69 | 24.41 | 23.19 | 128.78 |
| Discounted at 8.00% | 27.73 | 25.68 | 23.78 | 22.01 | 20.38 | 119.58 |

134.   For comparison with the above hypothetical stream of cash flows, as of year end 2021, Arcadia reported Adjusted EBITDA of $29.951 million, and reported goodwill of $141.7 million. Also at the time of the Arcadia acquisition, the Secured Overnight Financing Rate ("SOFR"), which replaced LIBOR as of June 30, 2023, was less than 0.25%.  Arcadia's actual cost to borrow in 2021 was roughly 1.75% plus the prevailing

SOFR rate (as of year-end 2021). As shown above, even using the same 5-year annual cash flow forecast of $29.95, the net present value ("NPV") of that stream of cash flows would fall from roughly $140.1 to $119.6 just from an increase in discount rates from 2.25% to 8.0%.[9] The NPV calculations above would fall further if the projections of the cash flows also decreased, and the same is true of Arcadia's goodwill when valued under the income approach, if the projections of future cash flows also decreased.[10]

135.    The glaring need for Defendants to apply a higher discount rate when valuing Arcadia's goodwill under the income approach became even more pronounced at the beginning of Q1 2024 because that was when DMC increased its debt capacity to finance the then looming put/call option. In connection with that refinancing, DMC's lenders increased the rate that it charged DMC to borrow. So while general increases between 2021 and 2024 caused market-based interest rates to increase (i.e., so-called "base rates"), and those base rate increases in turn caused DMC's borrowing cost to rise

---

[9] Before refinancing its credit agreement on February 6, 2024, DMC was charged borrowing costs of SOFR plus 1.25% - 2.25% under its pre-amended credit agreement. See image under ¶105. After amending that agreement, DMC's rate increased to SOFR + 2.25 – 3.25%. At the time of the Arcadia acquisition, average SOFR rates were between zero and 0.5%. So DMC would pay roughly 0.5% (base rate) + 1.25 - 2.25% (spread over base rate) or around 2.25% (using the midpoint of the spread). By the end of 2022, SOFR rose to around 3.5%, which would increase DMC's borrowing cost to (3.5% + 1.75%) or around 5.25% (using the midpoint of the spread). By January 2024, SOFR reached around 5.25%, so DMC would pay 5.25% plus the (increased) spread of 2.75% (using the midpoint of the spread) or a total rate of 8.00%.

[10] NPV calculations are substantially the same as a discounted cash flow ("DCF") analysis, and many finance professionals use the terms interchangeably. The point for purposes of valuing goodwill is simply what is the net value, in today's dollars, of a stream of future cash flows.

between 2021 through Q4 2023, DMC's February 2024 refinancing increased the spread that DMC pays *on top of* the rising base rates (staring in February 2024 after the refinancing). In other words, as of Q1 2024, there were both market forces (rising interest rates) and company-specific factors (increased debt load) that increased DMC's cost to borrow. Further, increased financing costs in turn increased DMC's WACC. Notably, EY instructs that issuers consider their WACC when using discount rates to value goodwill under the income approach. Indeed, DMC admits that "Discount rates are one of the more significant assumptions used in the income approach."

136. In sum, DMC's February 2024 refinancing—which increased borrowing costs, and thus DMC's discount rate in the income approach—was both a glaring red flag and an interim event that should have caused Defendants to conduct an interim test during Q1 2024.

137. Also, because higher rates both slow Arcadia's growth (i.e., reduce its future cash flows) *and* directly reduce the net present value of future cash flows—even if projected cash flows remain unchanged—the rising interest rate environment that preceded the Class Period and continued into Q1 2024 compounded the need for Defendants to impair Arcadia's goodwill before Q3 2024. The February 2024 refinancing that further increased DMC's WACC was yet another indicator that DMC's goodwill should have been impaired no later than Q1 2024.

138. Given the Individual Defendants' finance and accounting experience, they could not have been unaware of these dynamics at the time of their statements during the Class Period. Indeed, as O' Leary would later admit during DMC's Q3 2024 earnings

call on November 4, 2024, the fact that DMC "paid a very robust price at probably the top of the market for Arcadia" contributed to the goodwill impairment. O'Leary's recognition that DMC paid "a very robust price" reflects the fact that at lower interest rates (as at the time of the Arcadia acquisition), valuations increase—because the value of future cash flows are discounted at a lower interest rate. And by conceding that the transaction was made "at probably the top of the market," further confirms that once the market turned (i.e., once interest rates began to rise), the value of the asset acquired at the top, almost immediately begins to decrease.

139.    As shown by O'Leary's acknowledgement, the peak valuation that DMC paid for Arcadia contributed to the impairment: yet valuations began contracting due to the rising interest rates *well before* the impairment. Defendants thus had *yet another* strong indication that Arcadia's book value was impaired well before Q3 2024 given the rising interest rate environment that almost immediately followed the Arcadia acquisition.

   **D.    Defendants' Abrupt And Undisclosed Change To The Goodwill Valuation Methodology Supports A Strong Inference Of Scienter**

140.    Throughout the Class Period, Defendants reiterated to investors that DMC "estimate[s] the fair value of a reporting unit by using the income approach, specifically a discounted cash flow analysis" to value DMC's goodwill. Such representations were made in DMC's 10-Ks for the years ended 2022 and 2023, which were incorporated by reference into DMC's 10-Qs for the quarterly periods between Q1 2022 through Q2 2024.

141.    At no point between the filing of the Company's 2023 10-K and when the truth was ultimately revealed, did Defendants ever warn that they may ***change the valuation method*** for how Arcadia's goodwill was calculated.

142.    Yet, for Q3 2024 (when the impairment was belatedly recorded), Defendants did exactly that by switching the valuation method for Arcadia's goodwill. Specifically, Defendants admitted in the Q3 2024 10-Q that "The Company utilized the market approach to estimate the fair value of the Arcadia Products reporting unit" while noting that it "considered the income approach to validate the results."

143.    Further, as discussed above, the EY Advisory explains that "drivers of fair value for a reporting unit that is valued using the income approach may be cash flow projections, terminal growth rate or the weighted-average cost of capital (WACC), whereas the drivers of fair value for a reporting unit that is valued using the market approach may be applicable industry multiples such as multiples of revenue or earnings before interest, taxes, depreciation and amortization (EBITDA)."

144.    In other words, unlike the income approach, the market approach includes observable inputs of fair value, including but not limited to non-binding offers received from third-parties and comparative market multiples. Of course here, the non-binding offer received during the Class Period occurred *during Q2 2024* (*see* n.7 above on page 33). Thus, whether using the income approach or the market approach, DMC's goodwill was overstated as of Q1 2024 using the income approach; or, alternatively, overstated as of Q2 2024 using the market approach.

145.    Given all the red flags that Arcadia's goodwill was overstated as of Q1 2024 under the income approach, that Defendants switched to the market approach supports an inference of scienter because the switch suggests that it was either: (1) done knowingly to avoid incurring the impairment under the income approach as of Q1 2024; or (2) that

defendants recklessly delayed from Q2 2024 to Q3 2024 under the market approach because the third-party offer was made during Q2 2024. Either way, it supports an inference of intentional or reckless conduct.

###### E.    Defendants' Shifting Explanations For Arcadia's Impairment Support A Strong Inference Of Scienter

146.    Defendants gave contradictory reasons for what caused Arcadia's impairment. For example, when announcing the impairment on October 21, 2024, Defendants said that the "charge reflects Arcadia's **recent financial performance** and near-term outlook" and "[t]hese factors, combined with the significant decline in DMC's market capitalization, led the Company to conclude that the goodwill impairment charge was appropriate at this time."

147.    Yet, Defendants' October 21, 2024 explanation differed from what they said on the Q3 2024 earnings call. On November 4, 2024, when discussing Q3 2024, results, O'Leary stated:

> A macro comment, which I think, again, we might have underestimated and ***certainly contributed to the goodwill write-off, we bought a family business.*** We bought a family business that had excellent commercial people. They understood pricing. They understood their markets.
>
> They had the right titles, the right org charts, the right people that at first blush looked like they'd be able to handle the amount of change that comes with being a public company. And the digestion issues around ERP, putting in compliance around being a public company, making sure you've got, not just people who have the titles of VP of supply chain, but actually know what that means, particularly in a post-COVID environment.
>
> We underestimated the challenges there. A couple of -- we took a few calls after our last press release, and to me, these are things that are simple to diagnose, easy to spot, not really wildly difficult to fix if you have people with the right skill set, but take time.

And putting the ERP system on with the aggressiveness of the implementation, dealing with upgrading people happens with every family company acquisition I've ever seen, and really dealing with just the robustness of the systems and the people, exactly what you think in a family company.

The answer was no, and *that led to the write-off*.

148.    Unlike both DMC's October 21, 2024 announcement *and* its Q3 2024 10-Q, during the November 4, 2024 earnings call, O'Leary also seemed to attribute Arcadia being a family business as having contributed to the impairment (i.e., "write-off").

149.    Moreover, during the same November 4, 2024 earnings call, O'Leary continued to blame other things, such as the valuation that DMC paid for Arcadia as contributing to the impairment:

In terms of manufacturing prowess and all the things that, to be candid, a family company like Arcadia really didn't have a robust skill set at, that's the right guy to fill in a lot of those gaps right now.

So as I said, answer is yes, *market had a lot to do with it*. You combine the market *with the fact we paid a very robust price at probably the top of the market for Arcadia*.

We're not hiding from that. I mean, *that's why we wrote off* $142 million of goodwill.

150.    As shown above, O'Leary blamed, at various times, everything from market weakness, to paying too much for Arcadia at the "top of the market", to integration challenges of a family business for DMC's impairment. Those reasons – many of which have existed for years (e.g., that Arcadia was a family business, and that Arcadia paid too much for it) do not align with the purported "recent" financial performance and market capitalization declines that were initially attributed as the causes for the impairment.

151.    In DMC's 2024 Form 10-K filed on February 24, 2025 ("2024 10-K"), the reasons differed yet again. The 2024 10-K stated that "Goodwill impairment of $141,725 in 2024 relates to the full impairment of goodwill due in part to recent financial performance not in accordance with expectations and downward revisions to the near-term forecast." Notably, the 2024 10-K made no mention of DMC's purported decline in market capitalization as having contributed to the impairment (as was discussed in the October 21, 2024 release on the impairment, *see* ¶146). Nor was there mention of any integration challenges or of DMC paying too rich of a price at the time of the Arcadia acquisition (*cf.* ¶149).

152.    That Defendants offer differing reasons at differing times for the cause of DMC's impairment supports scienter.

**F.    The Magnitude Of The Goodwill Impairment Supports A Strong Inference Of Scienter**

153.    That Defendants impaired 100% of Arcadia's goodwill supports scienter because there was no single discrete event that occurred during the third quarter of 2024 that warranted a 100% goodwill impairment. The fact that no earlier, partial impairments, were ever taken in response to Arcadia's successive quarters of worsening financial performance, supports an inference that the impairment was knowingly or recklessly delayed.

154.    Indeed, the $141.7 million represents 15.4x DMC's Net Income of $9.861 million for the same quarter in the prior year; and roughly 20% of DMC's Q3 2024 assets after the impairment was taken.

G.    **Arcadia Is Critical To DMC's Core Operations**

155.    The critical importance of Arcadia to the Company's overall operations and financial results, as acknowledged by Defendants, bolsters the strong inference of Defendants' scienter. The Company described Arcadia as the Company's "core division," and Arcadia's performance significantly contributed to DMC's financial results. Since the Arcadia Acquisition, Defendants repeatedly emphasized that they were "enhancing operating efficiencies and the internal control environment" at Arcadia, which included implementing Arcadia's ERP system. Indeed, reflecting on the success of the ERP system implementation, during a call with investors and analysts on May 2, 2024, Defendant Kuta stated that "We're actually getting a lot of good visibility now out of our ERP system." At the start of the Class Period, in announcing that DMC's strategic initiative to sell off the DynaEnergetics and NobelClad divisions, Defendants emphasized their focus on Arcadia and that DMC was "taking a very focused approach toward maximizing [Arcadia's] differentiated business model and capitalizing on growth opportunities within it large addressable markets."

156.    The importance of Arcadia to DMC's core operations, and the visibility from Arcadia's ERP systems and controls, support the inference that the Individual Defendants knew, or at the very least were reckless in not knowing or disregarding, the facts which rendered Defendants' public statements materially false or misleading as alleged in this Complaint.

**H.     The Individual Defendants' Significant Experience With Public Accounting And The Company's Finances Supports A Strong Inference Of Scienter**

157.    Defendants Kuta, Walter, and Seger all have accounting degrees, MBAs, and have earned the CPA designation. Between them, they have decades of corporate accounting and finance experience (*see* the Individual Defendants' biographies at ¶¶14-16). Prior to assuming his role as DMC's CEO in 2023, Defendant Kuta served as DMC's CFO for 9 years. Defendant Walter has been DMC's CFO since February 2023, nearly a year before the start of the Class Period. Defendant Seger has served as DMC's Chief Accounting Officer since March 2023, and previously served as the Company's Vice President of Finance Integration since January 2022, with "the primary responsibility of managing the coordination of significant financial activities relating to the Company's subsidiary Arcadia."[11] Defendant Seger also worked as an auditor for 10 years at EY, which is DMC's auditor.

158.    The Individual Defendants' significant accounting and finance training and experience, along with their key accounting and financial reporting oversight roles at the Company, supports a strong inference that Defendants knew, or were reckless in not knowing or disregarding, the facts alleged herein concerning the GAAP goodwill impairment requirements and the improper delay of the impairment of Arcadia's goodwill.

---

[11] DMC's Proxy Statement, filed with SEC on April 2, 2024, at page 13.

## I.    Defendants Kuta And Walter Signed SOX Certifications

159.    In connection with the Company's 2023 10-K, Q1 2024 10-Q, and Q2 2024 10-Q filed during the Class Period (the "Reports"), Defendants Kuta and Walter signed certifications pursuant to the Sarbanes-Oxley Act ("SOX").

160.    Pursuant to Section 302 of SOX, Defendants Kuta and Walter each certified that they reviewed the Reports and "based on [their] knowledge" the Reports "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

161.    Defendants Kuta and Walter each also certified, pursuant to SOX Section 302, that:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

purposes in accordance with generally accepted accounting principles; [and]

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

162.    Pursuant to Section 906 of SOX, Defendants Kuta and Walter also attested to the Company's internal controls over financial reporting. Specifically, Defendants Kuta and Walter each certified, *inter alia*, that "(i) [t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (ii) [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

163.    By signing these certifications, Defendants Kuta and Walter certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective pursuant to SOX, evidencing their access to (and purported review of) DMC's and Arcadia's financial data, as well as the materially false and/or misleading statements set forth below in Section VI. Accordingly, Defendants Kuta and Walter knew, or at the very least were reckless in not knowing or disregarding, the facts which rendered Defendants' public statements materially false or misleading.

**J.    The Timing And Numerous Resignations Support A Strong Inference Of Scienter**

164.    The timing and circumstances of the resignations or removal of key executives and Board members, including Defendant Kuta, supports an inference of scienter. That these resignations or removals are temporally connected to the alleged corrective disclosures of the Company's accounting fraud supports that inference.

165.    On October 9, 2024, Chilcoff "stepped down" as President of Arcadia, a position he held when he was hired in January 2023 a part of the Company's plan to strengthen and improve Arcadia. Chilcoff's removal was just two weeks before the Company's announcement of the Company's Q3 2024 financial results revealing Arcadia's poor performance and the write-down of the $141.7 million in goodwill.

166.    Then, on October 16, 2024, Aldous resigned as a member of the Board and Chairman, "effective immediately." Aldous was the Company's long-serving Chairman and had served as interim co-CEO with Defendant Kuta from January 2023 to August 2023, having played a large part of the acquisition of Arcadia and the Company's strategic initiative. Also, on October 16, 2024, director Peter Rose notified the Company of his decision to retire from the Board.

167.    Finally, shortly after the disclosure of the Company's Q3 2024 results at the end of the Class Period, on November 13, 2024, the Company unexpectedly announced that Defendant Kuta would "retire" as the Company's President, CEO and as a member of the Board. Defendant Kuta was only 49 years old at his "retirement."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.    January 29, 2024 Press Release

168.    The Class Period begins on January 29, 2024, when before the market opened DMC issued a press release entitled, "DMC Global Announces Strategic Alternatives Process for DynaEnergetics and NobelClad Businesses." The press release described Arcadia as the Company's "**core division**" and stated in relevant part:

DMC Global [] today announced its board of directors ("the Board") has initiated a review of strategic alternatives for its DynaEnergetics and NobelClad businesses.

The strategic review process formalizes DMC's ongoing efforts over the past several months to consider opportunities for unlocking shareholder value. The Board has retained a financial advisor and may retain other advisors to assist the Board in evaluating DMC's current strategy, operations, and capital structure. **The Board will consider various strategic, business, and financial alternatives for DMC's DynaEnergetics and NobelClad businesses.** These could include, among other things, a sale, a merger or other business combination of a portion of DMC's business-unit assets, and/or a strategic investment.

David Aldous, DMC's chairman, said, "One year ago, we began evaluating and developing new operating strategies for our business units. Since Michael Kuta's appointment as CEO less than six months ago, we have been executing those strategies, and now are focused on opportunities to maximize the value of our portfolio with the help of our financial advisor."

Aldous continued, "**Arcadia Products is a core division of DMC**, and we are taking a very focused approach toward maximizing its differentiated business model and **capitalizing on growth** opportunities within its large addressable markets. **Both DynaEnergetics and NobelClad are valuable, industry-leading businesses with strong margin profiles**. However, the Board and management team are aligned with the view expressed by many DMC shareholders that the Company should seek to **simplify its portfolio to drive improved shareholder value**. During the review process, the Board and management team will continue to execute DMC's strategy and will remain very focused on running our businesses."

169.    The market reacted favorably to the Company's press release, with the share price gaining over 8% from the prior trading day on unusually high trading volume. Following the press release, Bloomberg News reported the Company's announcement and market reaction that day, including that "KeyBanc analyst Ken Newman [] says the announcement should be viewed favorably by investors" and quoting the analyst's note to clients stating, "While we are somewhat surprised by the timing of the announcement,

we think the prospect for a potentially simplified portfolio offering is in line with management's [long-term] objectives since acquiring Arcadia in December 2021."

170.    Defendants' statements in ¶168 were materially false and/or misleading when made because Defendants misleadingly suggested that: (i) Arcadia's business was growing, when, at the time, revenue had been contracting as discussed above at ¶¶108-122, including during the first four weeks of January 2024; and (ii) the underlying business at Arcadia, as of January 29, 2024, was performing better than the other two operating segments that were potentially going to be sold—because no reasonable investor would expect that a management team would focus their business model on the worst performing business.

## B.    2023 Form 10-K Statements And Omissions

171.    On February 23, 2024, Defendants filed the Company's 2023 10-K, which was signed by Defendants Kuta, Walter, and Seger. Defendants stated that to test goodwill impairment for the "quantitative assessment," the Company only cited the "income approach" to estimate the fair value of Arcadia, stating:

> **To test goodwill for impairment**, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.

> The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and

company-specific conditions and plans. ***In the Company's quantitative
assessment, we estimate the fair value of a reporting unit by using the
<u>income approach</u>, specifically a discounted cash flow analysis.*** A
number of assumptions and estimates are required in performing the
discounted cash flow analysis, including forecasts of revenues, gross
profits, capital expenditures, discount rates, working capital changes, and
terminal growth rates. Actual results may differ from those assumed in the
forecasts.

As of December 31, 2023, the carrying value of goodwill was
$141,725[,000] and relates entirely to the Arcadia Products operating
segment and reporting unit. As of the date of the 2023 annual impairment
test, we performed a quantitative assessment and concluded that the fair
value of the Arcadia Products reporting unit exceeded its carrying value by
approximately 10%. Discount rates are one of the more significant
assumptions used in the ***<u>income approach</u>***. If the Company increased the
discount rate used by approximately 100 basis points, the fair value of
Arcadia Products would still exceed its carrying value. A sustained decline
in general economic conditions, activity levels in end markets or equity
valuations could impact the judgments and assumptions used to estimate
the fair value of Arcadia Products, and the Company could be required to
record an impairment charge in the future. If the Company was required to
recognize an impairment charge in the future, the Consolidated Balance
Sheets and Consolidated Statements of Operations and Comprehensive
Income (Loss) could be materially impacted; however, the non-cash charge
would not impact the Company's consolidated cash flows, current liquidity,
and capital resources.

172.    Defendants' statements in ¶171 that the Company used the "income

approach" for the quantitative assessment of goodwill impairment was materially false

and/or misleading when made because Defendants omitted material facts, including, *inter*

*alia*, that (i) the goodwill valuation method was subject to change without further notice to

investors; (ii) the Company could also use the "market approach" to valuing goodwill; and

(iii) as a result, the factors that influence the "income approach", e.g., discount rates, do

not bear on the goodwill valuation under the "market approach." Defendants never

warned that they may change the valuation method for how Arcadia's goodwill was

calculated, which Defendants did just two quarters later when the Company belatedly wrote off the entire $141.7 million of goodwill. By speaking on the methods of how Defendants would value DMC's goodwill, Defendants assumed a duty to speak completely, including a duty to disclose to investors that the valuation method for valuing DMC's goodwill is subject to change.

### C.    First Quarter 2024 Statements And Omissions

173.    On May 2, 2024, after the markets closed, DMC issued a press release entitled, "DMC Global Reports First Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter. The press release announced Q1 2024 results including: $2.3 million in net income; $4.2 million in adjusted net income; and $0.21 adjusted diluted EPS.

174.    On May 2, 2024, after the markets closed, DMC also filed its unaudited Q1 2024 10-Q with the SEC which was signed by Defendants Walter and Seger. The Q1 2024 10-Q repeated the Q1 2024 results from the press release including: $2,319,000 in net income; and $4,167,000 in adjusted net income; and $0.21 adjusted diluted EPS.

175.    The Q1 2024 10-Q also reported goodwill of $141,725,000 as of March 31, 2024. The Q1 2024 10-Q incorporated by reference the 2023 10-K, including the Company's goodwill statements and discussions of the "income approach," as set forth above in ¶171, and stated that "Our critical accounting estimates have not changed from those reported in Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's [2023 10-K]."

176.    Attached to the Q1 2024 Form 10-Q were certifications pursuant to Sections 302 and 906 of SOX signed by Defendants Kuta and Walter attesting to the accuracy of the statements and financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud. The Q1 2024 Form 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

177.    Defendants' statements in ¶¶173-175 were materially false and/or misleading when made because, based on Defendants' reasons for the Q3 2024 impairment, which also existed in Q1 2024, DMC's goodwill should have been impaired in Q1 2024, and as a result of the foregoing, by failing to impair $141.7 million in goodwill during Q1 2024, DMC's reported income was overstated by $141.7 million; DMC's total assets were materially overstated by $141.7 million; and the Company's financial results were not prepared in conformity with GAAP. By not recording the goodwill impairment on a timely basis, DMC's shareholders' equity was also overstated by $141.7 million as of March 31, 2024.

### D.    Second Quarter 2024 Statements And Omissions

178.    On August 1, 2024, after the market closed, DMC issued a press release entitled, "DMC Global Reports Second Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter. The press release announced

Q2 2024 results including: $6.3 million in net income; $5.7 million in adjusted net income; and $0.29 adjusted diluted EPS.

179.   On August 1, 2024, after the market closed, DMC also filed its unaudited Q2 2024 10-Q with the SEC which was signed by Defendants Walter and Seger. The Q2 2024 10-Q repeated the Q2 2024 results from the press release including: $6,293,000 in net income; $5,675,000 in adjusted net income; and $0.29 adjusted diluted EPS.

180.   The Q2 2024 10-Q also reported goodwill of $141,725,000 as of June 30, 2024. The Q2 2024 10-Q incorporated by reference the 2023 10-K, including the Company's goodwill statements and discussions of the "income approach," as set forth above in ¶171, and stated that "Our critical accounting estimates have not changed from those reported in Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's [2023 10-K]."

181.   Attached to the Q2 2024 10-Q were SOX certifications signed by Defendants Kuta and Walter attesting to the accuracy of the statements and financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud. The Q2 2024 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

182.    Defendants' statements in ¶¶178-180 were materially false and/or misleading when made because: (i) based on Defendants' reasons for the Q3 2024 impairment, which also existed in Q1 2024, DMC's goodwill should have been impaired in Q1 2024, and as a result of the foregoing, by failing to impair $141.7 million in goodwill during Q1 2024, DMC's total assets were materially overstated by $141.7 million during Q2 2024 (because the goodwill asset carried over from Q1 2024 to Q2 2024); (ii) the Company's financial results were not prepared in conformity with GAAP; (iii) by not recording the goodwill impairment on a timely basis during Q1 2024, DMC's shareholders' equity was also overstated by $141.7 million as of June 30, 2024; and (iv) by not disclosing that DMC's goodwill valuation methodology was subject to change from the income approach to the market approach, DMC's financials were materially misleading because during Q2 2024, DMC received the very third-party offer that Defendants claim they used to value and impair DMC's goodwill during Q3 2024.

## VII.    <u>LOSS CAUSATION</u>

183.    During the Class Period, Defendants made materially false and/or misleading statements as detailed in this Complaint. This artificially inflated or maintained the price of DMC common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and omissions concealed by the fraudulent conduct alleged in this Complaint materialized and were disclosed publicly to the market on October 21, 2024, and November 4, 2024, the price of DMC's common stock fell precipitously and in a significant manner, as set forth above in ¶¶86-97. Indeed, following the corrective disclosures on October 21, 2024, the closing price of DMC's common stock

fell more than 18% from $12.93 per share on October 21, 2024, to $10.57 per share the next day, on high trading volume. Then, following the corrective disclosures on November 4, 2024, the closing price of DMC's common stock fell more than 6% from $9.84 per share on November 4, 2024, to $9.25 per share the following day, on high trading volume.

184.    As a result of their acquisition of DMC common stock during the Class Period and Defendants' material misstatements and omissions, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws. Defendants' materially false and misleading statements caused DMC common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $19.49 per share on March 28, 2024.

185.    The declines in the price of DMC common stock after the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

186.    The economic loss, i.e., damages suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of DMC common stock and the subsequent significant decline in the value of DMC common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

187.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

188.    The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

189.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DMC who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

## IX.    THE PRESUMPTION OF RELIANCE

190.    Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for DMC securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market

for DMC's securities was open, well-developed and efficient for the following reasons, among others:

> (a)    DMC common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> (b)    As a regulated issuer, DMC filed periodic public reports with the SEC;
>
> (c)    DMC regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)    DMC was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

191.    As a result of the foregoing, the market for DMC's securities promptly digested current information regarding DMC from all publicly available sources and reflected such information in DMC's share price. Under these circumstances, all purchasers of DMC's securities during the Class Period suffered similar injury through

their purchase of DMC's securities at artificially inflated prices and a presumption of reliance applies.

192.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    CLASS ACTION ALLEGATIONS

193.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons and entities that purchased or otherwise acquired DMC securities between January 29, 2024 and November 4, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

194. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DMC's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of DMC shares were traded publicly during the Class Period on the NASDAQ.

195. Record owners and other members of the Class may be identified from records maintained by DMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

196. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

197. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

198. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DMC; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

199.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### Violations Of Section 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder Against All Defendants

200.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

201.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase DMC's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

202.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DMC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

203.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DMC's financial well-being and prospects, as specified herein.

204.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DMC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DMC and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

205.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

206.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DMC's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge

of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

207.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DMC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and/or misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired DMC's securities during the Class Period at artificially high prices and were damaged thereby.

208.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DMC was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their DMC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

209.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

210.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**COUNT II**</u>
**Violations Of Section 20(a) Of The Exchange Act**
**Against The Individual Defendants**

211.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

212.   The Individual Defendants acted as controlling persons of DMC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

213.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

214.    As set forth above, DMC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a).

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

XIII.    **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

DATED: June 23, 2025                          **GLANCY PRONGAY & MURRAY LLP**

<u>*s/     Takeo A. Kellar*</u>
Raymond D. Sulentic
Takeo A. Kellar
Glancy Prongay & Murray LLP
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (310) 201-9150
Email:  rsulentic@glancylaw.com
           tkellar@glancylaw.com

Robert V. Prongay
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email:  rprongay@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*John Mark Stauffer*

LAW OFFICES OF HOWARD G. SMITH
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847

*Additional Counsel*