IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 24-cv-03387-GPG-CYC
*Consolidated with* Civil Action No. 25-cv-00277-GPG-CYC

SAMUEL GARSON, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

DMC GLOBAL INC.,
MICHAEL KUTA,
ERIC V. WALTER, and
BRETT SEGER,

Defendants.

---

**ORDER**

---

Before the Court is Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Amended Complaint (D. 57). The Court GRANTS the motion for the following reasons.

## I. BACKGROUND

Plaintiff brings a private security class action.[1] Defendant DMC Global Inc. (DMC) is a publicly traded company incorporated in Colorado. Defendants Michael Kuta, Eric V. Walter, and Brett Seger are executives or former executives of DMC.

[1] The Court draws the operative facts from the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws and Jury Demand (Complaint) (D. 47).

On December 23, 2021, DMC acquired a 60% controlling stake in Arcadia Products, LLC (Arcadia)[2] for $282.5 million in cash and DMC stock. Arcadia "supplies architectural building products, including exterior and interior framing systems, curtain walls, windows, doors, and interior partitions to the commercial construction market; it also supplies customized windows and doors to the high-end residential construction" (D. 47 at 10). Arcadia's recent performance was very strong prior to the acquisition. It did not fare so well after the acquisition, primarily due to market changes such as increased interest rates that slowed the construction market.

Although Plaintiff Samuel Garson does not allege misconduct in relation to the acquisition, some aspects of the acquisition are relevant to the claims. "At the time of the Arcadia Acquisition, DMC's total market capitalization was approximately $688.5 million, based on a closing share price of $36.74 on December 16, 2021" (D. 47 at 13). "To fund a portion of the purchase price for the acquisition, DMC entered into a new five-year syndicated credit facility, which included a $150 million term loan and a $50 million revolving line of credit . . . used to partially fund the acquisition" (*id*. at 13–14). The seller "had its own option, enabling [it] to sell its remaining 40% interest to DMC through a corresponding three-year put option" (*id*. at 14). With this put option, the seller "could obligate DMC to buy the remaining 40% of Arcadia that it did not own on or after the third anniversary of the Arcadia transaction (i.e., December 23, 2024)" with "20% in cash and 80% in shares" (*id*. at 15).

Because DMC paid a premium for Arcadia, there was some special accounting treatment. "Whenever a public company acquires another entity for more than the target's book value, a new asset called 'goodwill' is created" (D. 47 at 16). Goodwill corresponds to the "portion of the

---

[2] The Court also uses the term Arcadia to refer to the acquired Arcadia operating within DMC.

purchase price above the net fair value of all of the assets purchased (i.e., the target company's book value)" (*id.*). "Because DMC paid $282.5 million for Arcadia, and recorded $141.2 million in corresponding goodwill, that means the book value of Arcadia at the time that DMC bought it was $141.3 million (because goodwill is just the difference between the purchase price and the book value, so rearranging those figures, purchase price minus goodwill equals book value)" (*id.*). DMC's Form 10-K filed after the acquisition explained:

> Goodwill represents the amount by which the purchase price exceeds the fair value of identifiable tangible and intangible assets and liabilities acquired in a business combination. Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management.
>
> As of and for the year ended December, 31, 2021, all goodwill recorded within the Consolidated Balance Sheet relates to the Arcadia acquisition. Given the proximity of the acquisition date to the balance sheet date, a quantitative impairment assessment was not deemed necessary of performance. No goodwill was outstanding as of and for the year ended December 31, 2020.

(*id.* at 16–17).

Plaintiff's theory of liability is that Defendants "repeatedly overstated DMC's income[3] and assets by failing to impair goodwill attributed to DMC's acquisition of [Arcadia], despite mounting evidence and glaring red flags that such impairment was not only necessary, but obvious and

[3] Although the Complaint references income here, there are no allegations that Defendants misrepresented DMC or Arcadia's gross income.

inevitable" (D. 47 at 5). Plaintiff alleges four misleading statements made during the period between the acquisition and DMC taking a goodwill impairment based on Arcadia's poor performance:

1. January 29, 2024 Press Release stating in relevant part:

> DMC Global [] today announced its board of directors ("the Board") has initiated a review of strategic alternatives for its DynaEnergetics and NobelClad businesses.
>
> The strategic review process formalizes DMC's ongoing efforts over the past several months to consider opportunities for unlocking shareholder value. The Board has retained a financial advisor and may retain other advisors to assist the Board in evaluating DMC's current strategy, operations, and capital structure. The Board will consider various strategic, business, and financial alternatives for DMC's DynaEnergetics and NobelClad businesses. These could include, among other things, a sale, a merger or other business combination of a portion of DMC's business-unit assets, and/or a strategic investment.
>
> David Aldous, DMC's chairman, said, "One year ago, we began evaluating and developing new operating strategies for our business units. Since Michael Kuta's appointment as CEO less than six months ago, we have been executing those strategies, and now are focused on opportunities to maximize the value of our portfolio with the help of our financial advisor."
>
> Aldous continued, "Arcadia Products is a core division of DMC, and we are taking a very focused approach toward maximizing its differentiated business model and capitalizing on growth opportunities within its large addressable markets. Both DynaEnergetics and NobelClad are valuable, industry-leading businesses with strong margin profiles. However, the Board and management team are aligned with the view expressed by many DMC shareholders that the Company should seek to simplify its portfolio to drive improved shareholder value. During the review process, the Board and management team will continue to execute DMC's strategy and will remain very focused on running our businesses."

(D. 47 at 67).

2. February 23, 2024 Form 10-K stating in relevant part:

> To test goodwill for impairment, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.
>
> The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. In the Company's quantitative assessment, we estimate the fair value of a reporting unit by using the income approach, specifically a discounted cash flow analysis. A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.
>
> As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the income approach. If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could

> be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.

(D. 47 at 68–69).

3. May 2, 2024 Form 8-K reporting goodwill of $141,725,000 as of March 31, 2024

4. August 1, 2024 Form 8-K reporting goodwill of $141,725,000 as of June 30, 2024.

On October 21, 2024, DMC issued a press release indicating a change in business strategy and that it would take a goodwill impairment, stating in relevant part:

> DMC Global [] today provided an update on its business conditions and revised its third quarter financial guidance. The Company also commented on its strategic review process and announced governance changes. DMC said third quarter sales are expected to be approximately $152 million versus prior guidance of $158 million to $168 million. The results reflect weaker-than-expected sales at both Arcadia Products ("Arcadia"), DMC's architectural building products business, and DynaEnergetics, DMC's energy products business.
>
> Adjusted EBITDA* is now expected to be approximately $5 million versus prior guidance of $15 million to $18 million. Third quarter results will include inventory and bad debt charges at DynaEnergetics totaling approximately $5 million, as well as lower fixed overhead absorption on reduced sales at both Arcadia and DynaEnergetics.
>
> The Company said its third quarter financial results will include an approximate $142 million non-cash goodwill impairment charge associated with DMC's December 2021 acquisition of a controlling interest in Arcadia. The charge reflects Arcadia's recent financial performance and near-term outlook. These factors, combined with the significant decline in DMC's market capitalization, led the Company to conclude that the goodwill impairment charge was appropriate at this time.
>
> DMC president and CEO Michael Kuta, who is also leading Arcadia on an interim basis, said, "Arcadia's third quarter performance was affected by weak commercial and high-end residential construction

> activity, lower fixed overhead absorption, and supply-chain disruptions that impacted product availability."

(D. 47 at 33–34). DMC's stock price went down.

DMC seeks dismissal of all claims (D. 57).

## II. LEGAL STANDARDS

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

Though courts view allegations favorably to plaintiffs at the motion to dismiss stage, federal law creates a heavy burden on claimants alleging securities fraud. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) ("A plaintiff suing under Section 10(b) [of the Exchange Act] bears a heavy burden at the pleading stage."). The Private Securities Litigation Reform Act of 1995 (PSLRA) imposes "specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b)." *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1139 (D. Colo. 2011). With respect to claims under the Exchange Act based on a material misleading statement or omission, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To determine whether a misleading statement or omission is alleged, courts evaluate whether the facts alleged, "taken as a whole," . . . support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003). In applying this standard, the Tenth Circuit has directed courts to evaluate:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion

> that a reasonable person would believe that the defendant's statements were misleading.

*Id*. (citation omitted). After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id*.

A plaintiff must also "state with particularity facts giving rise to a "*strong*" inference that the defendants acted with scienter. *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1216 (10th Cir. 2023). "An inference of scienter is considered 'strong' only if proof of the allegations would lead a reasonable factfinder to determine that an inference of fraudulent intent or recklessness is at least as compelling as an innocent inference." *Id*. "Conduct is considered reckless only if the defendants (1) acted in 'an extreme departure from the standards of ordinary care' and (2) presented 'a danger of misleading buyers or sellers' that was [ ] known to the defendants or [ ] so obvious that the defendants must have been aware of the danger." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (quoting *In re Level 3*, 667 F.3d at 1343 n.12).

## III. ANALYSIS

Rule 10b–5(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To plead a claim for violations of Section 10(b), a plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Ave. Capital Mgmt. II, L.P. v. Schaden*, 131 F.Supp.3d 1118 (D. Colo. 2015) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460-61 (2013)).

Defendants argue that Plaintiff has failed to sufficiently allege a scienter and material misrepresentation or omission under the PSLRA (D. 57 at 20). The Court agrees, although it addresses material falsehood first.

**A. Plaintiff Has Not Shown that the Statements Were Materially Misleading.**

For a statement to be actionable, it must be false when made. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997). Thus, we examine a statement and its potential implications at that point and without the benefit of hindsight.

Plaintiff asserts that the January 29, 2024 "Press Release gave the misleading impression that Arcadia was performing well, because with the proposed sale of DynaEnergetics and NobelClad" (D. 58 at 26). But it does not point to anywhere in the press release saying that Arcadia is doing well. Instead, the Press Release suggests that Arcadia has a "differentiated business model" and has "growth opportunities within its large addressable markets." *See Grossman*, 120 F.3d at 1118 ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."). Nothing suggests that Arcadia lacked a differentiated business model or that it did not operate in a large market. Without any actual falsehood, Plaintiff must rely on creation of a false impression, asserting that the Press Release implies Arcadia's present success because "no reasonable investor would expect that a management team would focus their business model on the worst performing business" (D. 47 at 67). Why not? Companies sell of lines of business all the time, even when they are performing

well, particularly when they believe they can either realize a high current value for that operation (as the Press Release indicates—"unlocking shareholder value") or for myriad other reasons such as to avoid distraction and allow focus on a particular line of business (as the Press Release also indicates—"simplify its portfolio"). There is no false suggestion in the Press Release. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 (9th Cir. 2010) (holding that "we believe our employee relations are good" was a nonactionable, "mildly optimistic, subjective assessment").

Plaintiff asserts that the Q1 and Q2 financial statements were false because they did not reflect impaired goodwill. In Plaintiff's view, the failure to impair goodwill resulted in a false overstatement of the dollar value of goodwill and *net* earnings per share in its financial statements (D. 58 at 24). Accepting as true the allegations in the Complaint, it is unclear to the Court how DMC's statements about its goodwill could be false without a *requirement* that it test the goodwill before that point or an evaluation having been performed. According to the Complaint, the amount of goodwill is fixed by the transaction (D. 47 at 16). Thereafter, "[b]ecause goodwill is an intangible asset, its value is reported at the acquisition price unless or until circumstances arise in which the intangible asset *must* be written off, or 'impaired'" (*id.* at 17) (emphasis added). The only allegation plausibly establishing when DMC was required to test its goodwill is its own statement indicating that it would test the goodwill at least annually and, when it did so, it would use "the income approach, specifically a discounted cash flow analysis" (D. 47 at 18; *see also* at 31).[4] This required annual test would happen in December, such that no such required test would

[4] Plaintiff's other allegations on this issue are entirely conclusory (*e.g.*, D. 47 at 31–32) and at best suggest a discretionary determination could be made. Plaintiff does not offer any argument explaining why the alleged red flags required, as opposed to suggested, goodwill testing, and the Court declines to make the argument for Plaintiff (D. 58 at 24). Notably, this statement what DMC would test annually appears to be entirely consistent with GAAP and IFRS

happen in a period relevant to these alleged misstatements (*id.* at 18). Thus, the only inference that could be reasonably drawn from DMC's statement is that the goodwill valuation was considered using the income method at the last required check and it would happen again at least at the end of the year. There is no apparent inconsistency between this and restating that amount in Q1 and Q2 financial statements without further comment when no intermediate evaluation occurred. *Dearborn Heights*, 856 F.3d at 617–18 ("Plaintiff's bare allegations of events and circumstances during the Class Period that could have suggested the likelihood of goodwill impairment under GAAP cannot establish that Defendants must have known there was a likelihood of goodwill impairment.").

Plaintiff's final argument for a materially false statement is hard to parse. After an extended discussion of the income method for testing goodwill, Plaintiff asserts that, "[i]f investors had been told that a mid-year change in methods was possible (but they were not), investors could have determined, based on the observable input that occurred in Q2, that an impairment was required as of Q2" (D. 58 at 26). But the Complaint states that DMC used both the income approach and the market approach, with both approaches agreeing that a goodwill impairment should be taken. True, the disclosure describes using the market approach first and validating it with the income approach, but this is meaningless as a practical matter if the same result obtained under both. Further, it is not as though there are a multitude of approaches such that the use of

standards, which only require goodwill be tested annually. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 611 (9th Cir. 2017). Although Plaintiff cites various cases finding that the red flags were sufficient, each of those determinations were heavily fact dependent or contain only cursory analysis. *See id.* at 618. None appear to rest entirely on a delay in impairing goodwill, as Plaintiff's case does. It does not appear sufficient for a plaintiff to merely assert something that could potentially be a red flag requiring analysis of goodwill, such a missing a target, without evaluation of that specific indicator at least in comparison to something previously found to be sufficient.

another would be surprising; the Complaint alleges only the two used exist and both can be used in parallel (D. 47 at 30). The disclosures that Plaintiff points to simply discuss the annual test and do not disclaim the market approach. DMC's silence on the possibility that it might use the market approach in combination with the income approach would not be materially misleading to a reasonable investor.

Additionally, Plaintiff's argument that investors could have determined from public information that a goodwill impairment was likely or should occur points to a fundamental problem with Plaintiff's entire case—none of the information about the goodwill impairment appears to be material in this case. There is no allegation here that Defendants misstated any information on which goodwill testing is based. And much, if not all, of that information is public. Plaintiff alleges that "drivers of fair value for a reporting unit that is valued using the income approach may be cash flow projections, terminal growth rate or the weighted-average cost of capital (WACC)" (D. 47 at 30–31). DMC disclosed these or they could be reasonably determined by investors from other disclosures (*see e.g.*, D. 57-9; D. 57-12 at 27). Plaintiff alleges that "drivers of fair value for a reporting unit that is valued using the market approach may be applicable industry multiples such as multiples of revenue or earnings before interest, taxes, depreciation and amortization (EBITDA)" (D. 47 at 30–31). DMC disclosed these and other "observable inputs of fair value" (*id*. at 31). Thus, if it was important to them, investors could have used information available to determine if its divisions' value and if the valuation provided was proper. And it is unclear whether the decision to take, or not, the goodwill valuation had any practical effect on DMC's operations or prospects. DMC stated that, "[i]f the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and

Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources" (D. 47 at 68–69). This is not alleged to be false and is entirely consistent with the allegations in the Complaint—the impairment is merely a paper loss. So, investors had information from which, if they wished, they could make their own determination about whether goodwill is, should be, or soon would be impaired and the ultimate result of that impairment is simply a change in accounting treatment that does not affect DMC's existing assets or cash flow. There is nothing in the Complaint or Plaintiff's argument explaining why when in a given year the goodwill impairment was taken would affect a reasonable investor's decision. *Cf. United States v. Woods*, 571 U.S. 31, 33 (2013) (discussing advantages of paper losses in relation to tax treatment). Thus, even assuming Plaintiff had shown a misleading statement or omission, his claims would fail because he has not shown materiality.

Accordingly, the Court will dismiss Plaintiff's claims. The Court will briefly address scienter because it provides another basis for dismissal.

**B. Plaintiff's Allegations Do Not Support a Strong Inference of Scienter.**

"Scienter consists of a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." *Anderson*, 827 F.3d at 1236–37 (10th Cir. 2016), *as amended* (July 6, 2016) (internal quotation marks omitted).

Plaintiff argues that a strong inference of scienter is possible because of the "red flags" present, the alleged shifting explanations for the goodwill impairment, and the size of the

impairment, the obligation to cover the put option to purchase the remainder of Arcadia,[5] and the importance of Arcadia suggest scienter. Examination of each of these factors in relation to alternative inferences do not suggest scienter. *See Anderson*, 827 F.3d at 1237 ("Thus, the complaint suffices only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

Although not put in quite these terms by Defendants, who include executives making the business decisions, the most obvious alternative inference here is poor business judgment and a stubborn desire to make the Arcadia acquisition succeed in the face of bad decisions and bad luck. Basically, the poor outcome is better explained by incompetence (or bad luck) rather than malice (or recklessness sufficient to sustain a claim). *See Anderson*, 827 F.3d at 1238 ("The plaintiffs allege that the Spirit executives intentionally misrepresented or recklessly ignored economic realities. That is possible, but it is more probable that the Spirit executives were overly optimistic and failed to give adequate weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism.").

In acquiring Arcadia, DMC paid more than the market thought that Arcadia was worth and much more than Arcadia's assets were worth. This is reflected in the premium paid at purchase and the generation of the goodwill paper asset reflecting the "difference between the purchase price and the book value" (D. 47 at 16). The goodwill may correspond in some sense to "the

[5] As Defendants argue, DMC secured the line of credit necessary to cover any cash portion of its purchase obligation well before taking the goodwill impairment and before any purchase obligation would have become due. The Court has not discussed all of Plaintiff's arguments because some are plainly irrelevant, such as a competitor taking an impairment related to a different geographic market. *In re Level 3*, 667 F.3d at 1344 ("We too have assessed plaintiff's complaint holistically, though we limit our discussion here to the allegations most relevant to the issue of scienter.").

acquired company's brand name, customer base, customer relations, employee relations, and/or proprietary technology," giving the acquired company an ability to earn beyond its valuation (*id.*). But if there is not actually such surplus earning potential, then the goodwill essentially stands on nothing and will have to be written down.

The strongest inference from the factual circumstances here is a gradual turn from optimism in the face of bad luck to the realization that the situation was not going to turn around. As Plaintiff acknowledges in the Complaint, the key driver of Arcadia's performance was external and essentially unpredictable to Defendants. "Given Arcadia's business model, with direct exposure to the construction market, Arcadia was highly susceptible to rising interest rates. And because DMC bought Arcadia in late 2021, the timing of that purchase could not have been worse because interest rates began to surge" (D. 47 at 19). As interest rates rose, Arcadia repeatedly missed its revenue targets. This poor performance and its knock-on effects, such as a decline in market capitalization, constituted the entirety of the purported "red flags" (D. 47 at 50–51). Yet Defendants remained confident and announced a plan in January 2024 to sell off DMC's other two business units to focus on Arcadia's potential. Was this a bad decision? It turned out to be in retrospect, but Plaintiff points to nothing indicating that Defendants could not have reasonably believed at the time that Arcadia's fundamentals were strong notwithstanding what could reasonably be viewed as bad luck in the timing of the rise in interest rates that could turn around at any time. *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020) (finding no strong inference of scienter where the "allegations Plaintiff advances demonstrate the Individual Defendants were too optimistic about Western Union's compliance systems and failed to give

adequate weight to certain red flags, such as pending government investigations, at the time they made their alleged misstatements").

The poor performance continued apace through the first two quarters of 2024. There is no suggestion in the Complaint of a sudden crisis or other event indicating that a turnaround at Arcadia, for example, due to a drop in interest rates, was not possible through the period that Plaintiff asserts DMC should have impaired the goodwill. But then, of course, at some point the gradual deterioration came to a point that full recovery became remote enough that a wholesale strategic shift was called for, and Defendants made that shift—announcing that they were no longer attempting to sell the divisions other than Arcadia and were taking the goodwill impairment for Arcadia. *Compare In re Level 3*, 667 F.3d at 1345 ("Given the difficulty we have, even with the benefit of hindsight, in determining whether a conflict actually existed between the reports and defendants' statements, the strongest inference we can draw is that defendants were negligent in failing to put together the pieces.").

Plaintiff argues that the various rationales provided where "shifting," but none of them are contradictory, implausible, or mutually exclusive. At best they refer to various effects of the main problem—namely, loss of revenue resulting in decline in market capitalization, etc.—along with other potentially contributory issues, for example, difficulty integrating a family business and fully understanding an acquired company's operations. That many factors may have contributed to Arcadia's poor performance after acquisition is hardly surprising, much less implausible or contradictory. The size of the impairment and Arcadia's importance perhaps could motivate deception, but they are equally likely to motivate a stubborn determination to turn things around that does not rely on any deception. Notably, there is no indication that Defendants continued long

past when, with better luck, a recovery would have been possible. Instead, they took their proverbial medicine. These facts do not suggest a strong inference of scienter. Thus, even if the Court found material misrepresentations, it would still dismiss for failure to allege facts supporting a strong inference of scienter.

## IV. CONCLUSION

Accordingly, Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Amended Complaint (D. 57) is GRANTED and Plaintiff's Consolidated Amended Complaint (D. 47) is DISMISSED. It is FURTHER ORDERED that the Clerk of Court shall close this case.

DATED March 20, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge